921 A.2d 1100 (2007)
191 N.J. 1
TOTARO, DUFFY, CANNOVA AND COMPANY, L.L.C., a limited liability company of the State of New Jersey, Plaintiff-Respondent,
v.
LANE, MIDDLETON & COMPANY, L.L.C., a limited liability company of the State of New Jersey and David P. Middleton, Defendants, and
Merritt Lane, III, Defendant-Appellant.
Supreme Court of New Jersey.
Argued November 13, 2006.
Decided May 24, 2007.
*1102 Arnold C. Lakind, Lawrenceville, argued the cause for appellant (Szaferman, Lakind, Blumstein, Blader & Lehmann, attorneys).
John F. Gelson, Wall Township, argued the cause for respondent (McLaughlin Gelson, attorneys; Mr. Gelson and Shannon Fury Curtis, on the brief).
Justice HOENS delivered the opinion of the Court.
This breach of contract dispute comes before us as of right based on the dissenting opinion of one of the Appellate Division judges. That opinion raised a narrow issue concerning the trial court's calculation of damages and the sufficiency of the evidence adduced at trial in support of that award. Based on our review of the record and our analysis of the relevant principles of law, we affirm in part, reverse in part and remand.

I.
Defendant Merritt Lane, III is an accountant who began to practice his profession in 1978. In 1996, he decided to cease performing work that accountants refer to as "compliance work," which consists of preparing corporate and personal income tax returns, financial statements, bookkeeping and general payroll accounting. Instead, he decided that he would focus his practice on financial planning and estate planning matters.
In January 1997, as a part of his decision about the future focus of his practice, defendant agreed to form a new accounting firm with David Middleton. The new firm was to be known as Lane, Middleton & Company, L.L.C. (LMC) but was owned entirely by Middleton. In relevant part, Middleton agreed to pay defendant $5,600 for certain software licenses and $5,000 for furniture and related assets, and he agreed that the new business entity would take an assignment of defendant's lease for his office space. At the same time, defendant and Middleton entered into a five-year Consulting Agreement, pursuant to which defendant received an immediate payment of $50,000 and was guaranteed an annual payment representing thirty percent of the gross collections from defendant's then-existing clients. Defendant also agreed that he would work for the new entity as an accountant, for a fixed number of hours, which would decline over the five-year term of the Consulting Agreement, and that he would be paid at an agreed-upon hourly rate for that work. Defendant was also eligible to receive referral fees for new clients he brought to LMC.
In 2000, Middleton decided to sell the LMC practice. After defendant declined to purchase LMC, Middleton began to negotiate for the sale of LMC to plaintiff Totaro, Duffy, Cannova & Co., L.L.C. (TDC). He eventually made an arrangement *1103 with Daniel Duffy, one of plaintiff's principals, to sell the practice for $345,000. During the negotiations, Duffy asked Middleton whether defendant would agree to a restrictive covenant that would prevent him from competing with plaintiff. Although defendant was unwilling to sign a restrictive covenant, he did formally consent to the agreement of sale of LMC to plaintiff and he agreed that he would not solicit compliance work from any of LMC's clients. In particular, that agreement included the following terms relating to defendant:

Non-Compete. You agree that for a period of four (4) years after the date hereof you will not, individually or as an owner or employee of any business entity, solicit opportunities to provide compliance accounting services for any of the clients of LMC or any parties that were your clients at the time of the Original Purchase Transaction. You agree that TDCC [plaintiff] will be a third party beneficiary of this covenant and entitled to enforce the provisions of this Section 4.
In exchange for defendant's agreement to the terms of the sale, plaintiff agreed to provide defendant with office space for a period of one year, at no cost to him. In addition, plaintiff paid defendant $112,500 immediately, representing the final payment to which he would have been entitled as a result of his original agreement with Middleton. Following the February 2, 2001, closing, plaintiff began to perform accounting services, including compliance accounting services related to filing of income tax returns for the year 2000, for all of the then-existing clients of LMC.
Defendant, using the office space provided by plaintiff, continued to work for former LMC clients following the sale of the practice. However, he believed that the office space provided to him was inadequate and that the practice was poorly managed. In early May, 2001, defendant notified plaintiff in writing that he was ending his business relationship with plaintiff. In that letter, defendant reiterated his agreement[1] that he would not solicit compliance work from any of the firm's current clients with the exception of such work as might be related to his court appointments or trustee work. Defendant then immediately opened up his own competing accounting practice across the hall from plaintiff's offices.
Prior to his departure, defendant obtained a list of plaintiff's clients from its computer. Using information from that list, on June 28, 2001, defendant sent a solicitation package to approximately 150 clients he had worked for while he was associated with plaintiff's accounting firm, including clients of that firm, clients that plaintiff had secured in the purchase of LMC, and clients that had originally been defendant's own. The package contained a letter announcing the opening of defendant's office; a comprehensive fee schedule which included pricing for compliance work; a form "disengagement" letter for clients to send to TDC to end their relationship with TDC; a form "engagement" letter to return to defendant to signify their status as his clients; and an eight-page pamphlet summarizing recent changes to the federal tax code. Defendant does not dispute that this package constituted his solicitation of compliance work from those clients in violation of the terms of his agreement with plaintiff.
Within days of defendant's mailing of his solicitation package, plaintiff began receiving the form disengagement letters from *1104 clients requesting plaintiff to transfer their files to defendant. According to Duffy, before then, approximately five to ten of defendant's former clients had called and asked for him. Each was given defendant's new telephone number and told plaintiff that they planned to use his services. In early July, plaintiff began receiving ten to twenty of the form disengagement letters that defendant had sent out with his solicitation packages each day. In all, plaintiff received 159 of the form disengagement letters, and, at the time of trial, defendant was performing compliance accounting work for 140 of those 159 clients.

A.
Plaintiff filed suit alleging that defendant breached the non-solicitation agreement by soliciting former-LMC clients for compliance work and that he breached his duty of loyalty to TDC by obtaining the client list in order to mail out the solicitation package. Plaintiff sought compensatory damages and a restraining order prohibiting defendant from further contacting any former-LMC clients.[2]
Both parties presented their evidence during the course of the lengthy bench trial. Together, they called twenty-six clients who testified about their decisions to "disengage" plaintiff and retain defendant to serve as their accountant. In addition, based on a questionnaire sent out to a large number of the clients, the parties entered into a stipulation to the effect that these other clients would have given testimony consistent with those who were called.[3]
In summary, the witnesses testified that they had developed relationships with defendant, that they considered him to be their accountant, that they were dissatisfied with plaintiff's services, and that they would not have remained clients of plaintiff after they learned of defendant's departure from the firm. Although some of the witnesses conceded that they were motivated to terminate their relationship with plaintiff by defendant's solicitation letter, others testified that they did not recall receiving the letter or its enclosures from defendant. In addition to that testimony, each party presented the trial court with spreadsheets analyzing the billings attributable to each of the disputed clients, together with plaintiff's profit and loss estimates, both generally and as they related specifically to those clients before and after defendant sent his solicitation letter.

B.
The trial court issued a comprehensive letter opinion setting forth findings of fact and conclusions of law. The trial court found that although defendant was not bound by a general covenant not to compete, he was bound to honor the terms of his agreement that he would not solicit compliance accounting work from plaintiff's clients, regardless of whether or not *1105 they had originally been his personal clients. The court further found that the announcement letter, with its accompanying fee schedule and its engagement and disengagement letters, specifically referred to and solicited compliance work in breach of defendant's non-solicitation agreement. On appeal, defendant has not suggested that the trial court erred in any of these findings and concedes that he breached his agreement.
The heart of the dispute, however, at trial and on appeal, related to defendant's contention that because the clients who left plaintiff and retained defendant after his departure were, by and large, long-time personal clients of his who would not have remained as clients of plaintiff's firm after he left, plaintiff could not prove that it had suffered any damages attributable to his breach.
In addressing the question of damages, the trial court first noted that while the calculation of damages was difficult and the precise amount was uncertain, "there [was] no question that the plaintiffs have suffered damages" as a result of defendant's breach. The court then utilized a multi-part approach to calculate the damage award. In summary, the court first used plaintiff's client lists before and after defendant's departure to identify the clients that were lost. From that list, the court excluded certain individuals who were deceased, or who in fact had not received any solicitation letter from defendant. Using this methodology, the court calculated that the sum of $69,062.26 represented lost compliance accounting business during the first year after defendant's departure. Next, crediting testimony from plaintiff's principal Duffy that, based on his prior experience in purchasing accounting firms, he anticipated an attrition rate of thirty-five to forty percent, the court reduced that sum to $41,437.36, to account for business that plaintiff would have ordinarily expected would be lost.
By relying on documents demonstrating plaintiff's historical net profits, the court then calculated a fifty-three percent profit rate. Applying that figure to the lost business, the court concluded that $21,961.80 fairly represented lost profit attributable to clients who left because of defendant's solicitation letter, rather than through ordinary attrition. Finally, although there were four years remaining pursuant to the non-solicitation agreement at the time when defendant breached that agreement, the trial court found that by the time he did so, plaintiff had already received the benefit of the disputed clients' compliance accounting business for calendar year 2001. As a result, the trial court found that it would be appropriate to exclude that year from the damage award. Therefore, the trial court multiplied the lost profit figure that had been previously derived by three to account for the fact that three additional years remained on the agreement, for a total damage award of $65,885.40, to which prejudgment interest was added. See R. 4:42-11(b). The trial court entered judgment in December 2003.[4] Defendant moved for reconsideration, challenging the court's calculations of damages, but not contesting the sufficiency of the evidence on which the damage award in general was based. When that motion was denied, defendant filed his appeal.

C.
In an unpublished decision, the majority of the appellate panel affirmed the findings and conclusions of the trial court. In short, the panel agreed that plaintiff was "unquestionably economically injured by *1106 [defendant's] actions." Conceding that the calculation of damages was difficult in light of the pre-existing relationships between defendant and the clients he solicited, the panel commented that the "close temporal proximity between the mailing of the solicitation letters and TDC's receipt of 159 Lane-crafted disengagement letters, is sufficient evidence to infer that, had there been no interference, plaintiff would have received the economic benefit of servicing these clients," citing Lamorte Burns & Co. v. Walters, 167 N.J. 285, 296-97, 770 A.2d 1158 (2001).
The dissenting Appellate Division judge contended that the temporal proximity and the conceded use by the clients of the disengagement letter defendant had provided to them was insufficient to support an award of damages. Rather, the dissenting judge reasoned that the trial court erred in failing to use a proximate cause analysis to link the mailing of the solicitation letter to the damages plaintiff suffered, describing "the absence of such a finding [as] fatal." Referring to the record as inadequate to support the conclusion that any of the clients was motivated by the solicitation letter to leave plaintiff, the dissenting panel member concluded that the majority erred in confusing uncertainty of proof of liability for any damages with mere uncertainty as to the appropriate amount of damages. In that panel member's view, the injunctive relief, that is, the prohibition on defendant of solicitation of the former clients pending completion of the agreed-upon term of the agreement, was appropriate, but the award of damages was not.

II.
Our consideration of the matter is limited to the question raised in the dissent. Simply put, the issue is whether the trial court erred in "fail[ing] to find that [defendant's] mailing was a proximate cause of damage to plaintiff." Although seemingly simple on the surface, this question encompasses a number of distinct issues that require our attention. As we see it, we must first address the fundamental question of the basis for the finding of liability. That is to say, we must first consider whether a "but for" proximate cause analysis is appropriate in light of the conceded breach of contact. We must then consider, if it is not, what the appropriate relationship must be between the conceded breach and the asserted loss of clients. Finally, we must address the sufficiency of the evidence in the record as it relates to the calculation of damages. We address these issues in turn.

A.
Although plaintiff's complaint included numerous theories pursuant to which it sought to hold defendant liable, the trial court's analysis of the issues relating to an award of damages proceeded on the breach of contract theory alone. The lynchpin of the opinion, as far as liability is concerned, is that, in violation of his agreement not to do so, defendant actively solicited clients of plaintiff to "disengage" plaintiff and to send him their compliance work. That defendant breached the contract is beyond any doubt and he does not now suggest otherwise. That concession is significant, however, for it bears directly on our review of the methodology utilized by the trial court in the calculation of damages.
The trial court's opinion does not suggest that the court engaged in any analysis of the tort-based theories included in the complaint as a basis for an award of damages. Although plaintiff could have attempted to do so, the evidence needed to prove those theories was not offered. Thus, the elements required to sustain a recovery based on fraud, see Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624-25, *1107 432 A.2d 521 (1981), breach of duty, see Cameco, Inc. v. Gedicke, 157 N.J. 504, 517-18, 724 A.2d 783 (1999), tortious interference, see Baldasarre v. Butler, 132 N.J. 278, 293, 625 A.2d 458 (1993); Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 750, 563 A.2d 31 (1989), or estoppel, see W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 553, 562 A.2d 222 (1989), are not addressed in the trial court's opinion. Nor was there any need for the court to have done so, in light of the undisputed proofs that defendant breached his agreement not to solicit these clients for compliance work.
The trial court therefore analyzed the record as it related to the damages issue by utilizing contract, and not tort, principles. The significance of this contract-based analysis is that it is different from the arguments advanced by defendant and addressed on appeal. The focus of the parties and the appellate panel on proximate cause and the resulting reliance on business tort precedents, see Lamorte, supra, has, however, confounded the analysis of the sufficiency of the evidence on which the trial court's contract damage award was based.

B.
As this Court has held: "[j]udicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance." Donovan v. Bachstadt, 91 N.J. 434, 443-44, 453 A.2d 160 (1982). Each of these contract remedies serves a different purpose. Restitution returns the innocent party to the condition he or she occupied before the contract was executed. Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed. Performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement. See id. at 444, 453 A.2d 160.
Most often, courts award compensatory damages in a breach of contract action. See ibid.; accord 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961). The extent of a damage award, and its connection to the breach, has its origins in English Common Law, arising from the seminal decision in Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 (1854) (concluding that contract damages "should be such as may fairly and reasonably be considered as either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it."). Those ancient concepts of contract damages are echoed in the Restatement (Second) of Contracts. As explained in the Restatement:
(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
(a) in the ordinary course of events, or
(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.
(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.
[Restatement (Second) of Contracts § 351 (1979).]
*1108 This Court has also applied these principles to the determination of the measure of compensatory damages in a breach of contract claim. "Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Pickett v. Lloyd's, 131 N.J. 457, 474, 621 A.2d 445 (1993). We recognize that the goal is "to put the injured party in as good a position as . . . if performance had been rendered," Donovan, supra, 91 N.J. at 444, 453 A.2d 160 (quoting 5 Corbin, Contracts § 992, p. 5 (1951)). We have also held: "[w]hat that position is depends upon what the parties reasonably expected. It follows that the defendant is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made." Ibid. (internal citations omitted).
However, although the non-breaching party must demonstrate that, in order to be compensable, "the loss must be a reasonably certain consequence of the breach[,] . . . the exact amount of the loss need not be certain." Id. at 445, 453 A.2d 160. That reasoning is in accord with our ordinary considerations about contract damages that are uncertain in amount. See Kozlowski v. Kozlowski, 80 N.J. 378, 388, 403 A.2d 902 (1979) ("Where a wrong has been committed, and it is certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery courts will fashion a remedy even though the proof on damages is inexact."). As the trial court and the majority of the appellate panel recognized, mere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief. Although it complicates the precise calculation of damages, our courts have long held that "[p]roof of damages need not be done with exactitude. . . . It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Lane v. Oil Delivery Inc., 216 N.J.Super. 413, 420, 524 A.2d 405 (App.Div.1987); see Mosley v. Femina Fashions, Inc., 356 N.J.Super. 118, 128-29, 811 A.2d 910 (App.Div.2002), certif. denied, 176 N.J. 279, 822 A.2d 609 (2003).

C.
We therefore must consider whether the trial court's conclusion that the loss of clients was compensable comports with those well-settled notions of contract law. Plainly it does. Viewed through the lens of what the contracting parties knew when they made their agreement, there is ample support for the trial court's conclusion that the loss of compliance work for those clients was within their contemplation as a consequence of defendant's breach. First, when plaintiff purchased LMC, the compliance work for those clients was not being performed by defendant. On the contrary, his earlier decision to associate himself with Middleton was motivated by his desire to have someone else perform this work for his clients. In light of that, there can be no doubt that when defendant agreed that he would not solicit compliance work, he expected that plaintiff or its personnel would perform those services for his former clients. At the same time, when plaintiff purchased the practice and requested an agreement from defendant that he would not solicit compliance work, plaintiff plainly contemplated that were defendant to do so, the compliance work for those clients would be lost.
Even so, plaintiff was obligated to prove, by a preponderance of the evidence, that the losses it sought to recover were "a reasonably certain consequence of the breach." Donovan, supra, 91 N.J. at 445, 453 A.2d 160. That requires proofs of two separate kinds, both of which are the focus *1109 of the appeal. First, it requires plaintiff to demonstrate that clients were lost as a "natural and probable consequence" of the solicitation letter. Pickett, supra, 131 N.J. at 474, 621 A.2d 445. Second, it requires plaintiff to demonstrate the appropriate method for quantifying that loss.
Defendant's essential argument is that the clients would not have remained as clients of plaintiff's practice once they knew that he had left that firm. As he sees it, because he was permitted to terminate his association with plaintiff and set up a separate practice, as he did, across the hall from plaintiff's offices, it was inevitable that those clients would leave plaintiff and retain him to perform the very work he ultimately performed. In defendant's view, therefore, his solicitation letter, although a breach of the contract, could not have led to any damages at all. We disagree.
For purposes of plaintiff's breach of contract claim, the issue is not whether the clients would have left eventually, but whether they would have left when they did. As the trial court and the Appellate Division majority concluded, the clients responded to defendant's solicitation letter quickly and in large numbers, using the form disengagement letters he had provided to them to move their compliance work from plaintiff to defendant with great speed. The breach therefore was the impetus for that business to be lost when it was, an event that occurred earlier than it otherwise would have, had defendant been forced to wait until the clients eventually discovered that he had departed and undertook to find him.
Plaintiff had only to demonstrate that the breach caused the clients to leave when they did, that is, as soon as they received the offending solicitation letter. As the trial court correctly recognized, the fact that the clients would have ultimately left only bears on the calculation of damages. The trial court's analysis accounted for the fact that clients would have left when they learned of defendant's departure by reducing the first year's calculated loss in accordance with plaintiff's proofs about the expected attrition rate. The unrebutted proofs, however, also demonstrate that the loss attributed to defendant's breach would not have extended for the full three years remaining on the life of defendant's non-solicitation agreement.
This leads us to conclude that the trial court erred in part in his calculation of damages. The error is not in the identification of the clients whose business was lost or in the calculation of the initial quantum of losses attributable to the group of clients for lost compliance work, but in the manner in which the court evaluated the evidence demonstrating that all of the business would have eventually been lost even in the absence of a breach. To be sure, there is ample support in the record for the trial court's finding that plaintiff's historical data about attrition following acquisition of an accounting practice was credible. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). Similarly, the trial court's use of that data to reduce the damage award was permissible. The trial court's conclusion that $21,961.80 represented the loss attributable to defendant for the year immediately following his breach, at which time the clients would not have known of his departure, is supported by credible evidence sufficient for it to be sustained. Ibid.
However, in light of the undisputed evidence that all of the clients would have left plaintiff and retained defendant to perform their compliance work once they learned of defendant's departure in a non-breaching fashion, we see no evidence in the record that supports the trial court's decision to triple that annual loss to account for the *1110 remaining years of the contract. On the contrary, the record only supports the trial court's conclusion that each of the clients would have remained a client of plaintiff's in the first year following defendant's departure. In light of the fact that the compliance work was not being performed by defendant himself, but was being done by others working for plaintiff, during that first year, the clients would not have been aware that he had left. Because plaintiff's proofs do not demonstrate that the clients would not have learned of defendant's departure thereafter even in the absence of his breach, there is no support for the trial court's apparent conclusion that the loss would have continued at that same level for two more years. Rather, the evidence supports only the trial court's award of damages in the amount of $21,961.80 for the first year's losses.

III.
We therefore affirm the judgment of the Appellate Division to the extent that it affirmed the conclusions as to liability, we reverse in part the judgment as to damages, and we remand to the trial court for entry of a judgment awarding damages consistent with this opinion, together with interest.
For affirmance in part/reversal in part/remandmentChief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS7.
OpposedNone.
NOTES
[1] The letter is not included in the record on appeal, but the relevant contents of that letter were read into the record at trial.
[2] The complaint included a number of theories, including breach of contract, fraud, breach of duties of good faith and fair dealing, tortious interference with existing and prospective economic relationships and estoppel. Apart from the trial court's grant of injunctive relief, which defendant does not challenge, it appears that the court based its damage award on the breach of contract theory alone. We deem, therefore, all of the other theories to have been abandoned. See, e.g., Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 415 n. 1, 772 A.2d 34 (App. Div.2001).
[3] During the course of preparing the matter for briefing on appeal, the parties discovered that two audio tapes containing the recorded testimony of six of the witnesses were blank and could not be transcribed. In an effort to avoid a lengthy proceeding during which that testimony might be reconstructed, the parties agreed that their stipulation would be extended to those witnesses as well.
[4] The court also entered an order restraining defendant from soliciting former clients for three years, but declined to impose punitive damages for want of evidence.