**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4339-15T1

REALTY APPRAISAL COMPANY,

    Plaintiff-Respondent,

v.

CITY OF JERSEY CITY, a Municipal
Corporation of the State of New Jersey,

    Defendant-Appellant.

_____

        Argued May 17, 2017 — Decided June 13, 2017

        Before Judges Fuentes, Simonelli and Carroll.

        On appeal from the Superior Court of New
        Jersey, Law Division, Hudson County, Docket
        No. L-5899-13.

        Marguerite M. Schaffer argued the cause for
        appellant (Shain, Schaffer & Rafanello, P.C.,
        attorneys; Ms. Schaffer, of counsel and on the
        briefs; Sarah E. Fitzpatrick and Xiaosong Li,
        on the briefs).

        Philip Elberg argued the cause for respondent
        (Medvin & Elberg, attorneys; Mr. Elberg and
        Samuel R. Bloom, on the brief).

PER CURIAM

Defendant City of Jersey City (the City) awarded a contract to plaintiff Realty Appraisal Company to conduct a revaluation of all real property in the City after plaintiff submitted the lowest bid. Following a bench trial, the trial court found that the City breached the contract. The court granted plaintiff $984,511 in damages, pre-judgment interest of $46,519.55, and $114,786 in counsel fees and costs.

In this appeal, the City argues that: (1) the contract was illegal and against public policy due to a conflict of interest created by plaintiff's employment of the City's former Business Administrator; (2) plaintiff's deficient ownership disclosure form rendered the Contract invalid; (3) post-bid modifications invalidated the contract; (4) the trial court erred in finding that the City acted in bad faith in terminating the contract; (5) the damage award was improperly calculated; and (6) the trial court erroneously quashed certain trial subpoenas. Having considered defendant's arguments in light of the record and applicable legal standards, we affirm.

I.

On February 8, 2010, the Jersey City Committee for Revaluation (the committee) held an initial meeting to discuss a plan for the tax revaluation. During this initial meeting, then-City Business Administrator Brian O'Reilly announced his intention to recuse

himself from the process. O'Reilly had worked for the City for over two decades in various roles, including Business Administrator and Tax Assessor.

On March 26, 2010, then-mayor Jerramiah Healy requested formal authorization from the Hudson County Board of Taxation to conduct a revaluation. Thereafter, on April 30, 2010, the Board of Taxation ordered the City to conduct a revaluation of all City properties after determining that its property assessments distributed the tax burden inequitably and unconstitutionally.[1]

Eduardo Toloza served as City Tax Assessor at the time of the Board of Taxation's revaluation order. Toloza testified at trial regarding the need for the revaluation, noting that some City residents paid far less than their fair share of property tax, and others far more, as property values in downtown Jersey City appreciated at a quicker rate. This disparity grew for decades before the City undertook the revaluation process. As a result, the City's coefficient of deviation as calculated by the Division

---

[1] A tax revaluation ordered by a county board of taxation, as here, involves reappraising each parcel of real property within a municipality. See N.J.A.C. 18:12A-1.14. A tax revaluation may be ordered to comply with the statutory requirement that "all property . . . shall bear its full and just share of taxes." N.J.S.A. 54:3-13.

of Taxation was the highest of any municipality in New Jersey, and its ratio of assessment to true value was among the lowest.

The Director of the Division of Local Government Services authorized the City to use "competitive contracting"[2] to award the contract, pursuant to the Local Public Contracts Law, N.J.S.A. 40A:11-1 to -51. Revaluation companies are regulated by the Division of Taxation pursuant to N.J.A.C. 18:12-4.2, and must be approved by the Division of Taxation on an annual basis. N.J.A.C. 18:12-4.4(a). One such company is plaintiff, which has conducted revaluations in New Jersey since 1951, and is the only revaluation company with an office in Hudson County. According to its bid, plaintiff has conducted multiple revaluations of municipalities in Hudson County in recent years, including a revaluation of the City in 1965.

O'Reilly testified that, in January or February 2010, he recused himself from any involvement in the revaluation process. He stated he did this because he did not "want to have any post-employment restrictions" following his contemplated retirement from the City. In addition to informing Toloza of his recusal,

---

[2] Competitive contracting is a process by which municipalities "establish[] weighting criteria and evaluat[e] proposals . . . [thereby] finding that a specific proposal is the most advantageous, price and other factors considered[.]" N.J.A.C. 5:34-4.3(d).

O'Reilly also told Dominick Pandolfo, the mayor's chief of staff; Kevin Lyons, an aide to the mayor who worked on the budget and personnel committee; and the revaluation committee itself.

O'Reilly testified he was "not involved . . . one iota" with the revaluation committee, because he was aware of the potential for a conflict of interest. O'Reilly conceded that, while still Business Administrator, he asked assistant Business Administrator John Mercer to serve on the revaluation committee. However, he made it clear to Mercer that he was recusing himself from the revaluation process entirely and that Mercer was not to speak to him about the committee's work. Eventually, the committee was comprised of seven City employees, including: Toloza; Mercer; Mary Ann Murphy, the Assistant Corporation Counsel; Jeff Wenger, a planner in the Department of Housing, Economic Development, and Commerce; Donna Mauer, Jersey City Chief Financial Officer; Michele Hennessey, a Tax Assessor; and Roxanne Mays, a Tax Assessor.

After the City committed to the revaluation in 2010, the committee held several meetings to discuss, plan for, and organize the process. It conducted an initial meeting on February 8, 2010, as well as subcommittee meetings on February 23, 2010; February 24, 2010; March 1, 2010; March 23, 2010; March 26, 2010; and April 14, 2010. Although these meetings occurred before O'Reilly

retired, he attended only the initial February 8, 2010 meeting, for the limited purpose of announcing his intent to recuse himself from the revaluation process. Toloza testified that thereafter O'Reilly was not involved in the revaluation process, nor did he attempt to influence the constitution of the committee or its decisions.

O'Reilly retired from his employment with the City as Business Administrator on July 31, 2010. In October 2010, O'Reilly began working part-time for plaintiff at a rate of $75 per hour. Plaintiff requested that O'Reilly assure there would be no conflict of interest concerning its work with the City should plaintiff hire him. O'Reilly sought a legal opinion from then-Jersey City Corporation Counsel, William Matsikoudis, as to whether the City's "Revolving Door Ordinance," Jersey City Municipal Code sections 33-1 and -3, precluded him from working on plaintiff's projects that involved the City. The Ordinance provides, in pertinent part:

> No employee of the city, whether paid or unpaid, shall for a period of one (1) year after leaving employment receive compensation from any person, firm or entity in relation to any case, application, project or matter with which the employee was directly concerned or in which the employee directly participated or with respect to which the employee had access to special knowledge or information during the employee's employment with the City of Jersey City.

6

[_Jersey City Municipal Code_ § 33-1.]

Notably, Section 33-3 of the Ordinance allows former employees to engage in private employment or activities that Section 33-1 would otherwise prohibit if either the head of the affected department certifies in writing that the former employee's activities or employment would serve the interest of the city, or the corporate counsel provides written approval. _Jersey City Municipal Code_ §33-3.

Matsikoudis advised "it is apparent that [O'Reilly] has not participated in the business of the [revaluation] committee or influenced any actions thereof." He concluded that O'Reilly's employment with plaintiff would not violate the "Revolving Door Ordinance," writing:

> Based upon the facts provided, [O'Reilly's] lack of involvement with [the City's] property tax revaluation project is apparent. Thus, I am of the opinion that [O'Reilly is] not in violation of Section 33-1 . . . of the [Jersey City] Municipal Code if [he] should become employed by a property tax revaluation firm under contract with the City of Jersey City, even if such employment were to occur within a year of [O'Reilly's] retirement.

Neil Rubenstein, one of plaintiff's principals, indicated that the company relied on Matsikoudis' opinion that hiring O'Reilly would not violate any conflict of interest rules.

On November 10, 2010, the City issued its Request for

Proposals (RFP) seeking bids for the revaluation contract. Four firms, including plaintiff, submitted bid proposals.

In its proposal, plaintiff highlighted the benefits of O'Reilly's employment. Section 3.4 of plaintiff's Executive Summary noted O'Reilly "brings tremendous knowledge and experience" and he would be "instrumental in valuing a variety of Jersey City properties" due to his expertise in the area involving "recently built and tax abated properties." It also highlighted the fact that O'Reilly dealt with plaintiff during his time working for the City, noting that, "[i]n 2001, [plaintiff] was engaged by [O'Reilly] to inspect, measure and prepare property record cards for the major long term tax abated properties, including the [Newport Mall]."[3]

Section 3.9 of plaintiff's proposal identified O'Reilly as the person responsible for phases of the revaluation such as public education and neighborhood delineation. Section 3.14 stated O'Reilly's role would include working on "Public Education, Tax Map Review, Neighborhood Delineation, Tax Exemptions, Sales Analysis, and Project Management."

Plaintiff included a "Corporation or Partnership Statement" in its bid proposal as required by N.J.S.A. 40A:11-4.4(d) and the

---

[3] O'Reilly testified that he served as tax assessor from 1999-2003.

terms of the RFP. Plaintiff certified that it only had two principals holding an interest of ten percent or greater in the company, Stanley Rubenstein and Robert Rubenstein.

Plaintiff's ultimate bid price was $3,150,000, which was approximately $2,000,000 below the next lowest bid. Neil Rubenstein testified that only he, Stanley, Robert, and Steven Rubenstein were involved in determining the bid amount. O'Reilly was not involved, and all information used in plaintiff's bid calculation was based on public knowledge that was available to all bidders.

Plaintiff also made a presentation to the City before a decision was made on its proposal. O'Reilly attended the presentation, but not as a negotiator in the bidding process. He testified he attended only because "the committee wanted a staff meeting with the principals and the folks that are going to be doing the work to ensure . . . [that everyone] was on the same page."

On February 9, 2011, the City passed Resolution No. 11-806 by a vote of five to two, thereby awarding the revaluation contract to plaintiff. The only council members voting "no" were Steven Fulop and Nidia Lopez, with Fulop apparently expressing concern over O'Reilly's potential conflict of interest. In October 2011, plaintiff terminated O'Reilly for violating company policy.

Toloza testified that the contract completion date was delayed for a year. The delay was attributable to the City's own internal problems, specifically its failure to deliver updated tax maps to plaintiff. Toloza indicated plaintiff was not at fault for the delay, which the City's designated representative,[4] Robert Kakoleski, confirmed. Moreover, every fact witness called at trial, including those presented by the City, confirmed that, as of June 2013, the revaluation was on schedule to be completed by the extended deadline.

Fulop was elected mayor in May 2013. On June 25, 2013, he suspended work on the contract. In a letter to then-Jersey City Business Administrator Jack Kelly, Fulop explained his decision as follows:

> As you know, [the City] contracted in February [] 2011, with [plaintiff] to perform a City-wide revaluation. Originally, that contract called for the revaluation to be completed by December [] 2012. Substantially behind schedule, the contract date has now been extended until May [] 2014.
>
> From the start there have been grave concerns regarding the manner in which proposals for the revaluation contract were reviewed and recommended by the Administration. Not the least of those concerns involves the role played by the City's prior Business Administrator who, after

---

[4] See R. 4:14-2(c) (authorizing an organization to "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf").

leaving the City, became employed by [plaintiff].

In addition, there have been concerns raised about the impact of hurricane Sandy on property value and [whether] this impact dictates nullification of any assessments already undertaken and starting the process over again. Similarly, concerns about methodology and the fact that the process has taken an excessive amount of time resulting in property values changing while the revaluation is taking place call into question the validity of any report that might be produced.

. . . .

Given the performance to date of [plaintiff] I request that you immediately direct that [plaintiff] suspend all work under this contract until such time that you and my Administration can conduct a thorough review of the contract procurement process, [plaintiff's] performance, and the efficacy of pursuing a revaluation of the City in the current economic environment.

On July 5, 2013, Kelly sent an email to Toloza informing him that plaintiff would not be paid for any work on the contract performed after June 30, 2013. Thereafter, no representative from Fulop's administration ever met with Toloza or plaintiff to discuss a review of the contract or its suspension.

Section 7.9 of the RFP contained a "termination for convenience" provision that stated:

Should a dispute arise, and if, after a good faith effort at resolution, the dispute is not resolved, either party may terminate

11

> the contract by providing sixty (60) days
> written notice to the other party.
> Regardless, the City reserves the right to
> cancel the contract by providing sixty (60)
> days written notice to the Revaluation Firm.

In its April 14, 2016 decision, the trial court determined that Section 7.9 constructively applied to the City's termination of plaintiff's services, even though the City did not provide the requisite notice. The court additionally found the City's termination of the contract was in bad faith. Consequently, the court awarded plaintiff lost profits, which it deemed the "normal measure of damages[.]"

Neil Rubenstein testified that, at the time Mayor Fulop suspended the contract, plaintiff was owed $270,000 for work that was completed and had been billed to the City but never paid. Additionally, plaintiff claimed retainage damages of $250,000. Neil Rubenstein noted plaintiff saved $185,489 as a result of defendant's termination of the contract. In its April 14, 2016 decision, the court found Rubenstein's testimony credible and awarded plaintiff $984,511. The court calculated this damage award by deducting the amount plaintiff saved ($185,489) and the amount it was already paid ($1,980,000) from the $3,150,000 contract amount.

The court memorialized its decision in an April 26, 2016 judgment, which also awarded plaintiff $46,519.55 in pre-judgment

interest.  On May 9, 2016, plaintiff filed a motion seeking counsel fees and litigation expenses based on the City's rejection of a pre-trial $750,000 offer of judgment.  On June 3, 2016, the court awarded plaintiff $114,786 in counsel fees and expenses pursuant to Rule 4:58-2(a).  This appeal followed.

II.

Our analysis of the issues presented on appeal is framed by well-settled standards:

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"
>
> [Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008))].

"[W]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence."  Mountain Hill, L.L.C. v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)), certif. denied, 199 N.J. 129 (2009).  "[I]n reviewing the factual findings and conclusions of a trial judge, we are obliged to accord

deference to the trial court's credibility determination[s] and the judge's 'feel of the case' based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare v. Cesare, 154 N.J. 394, 411-13 (1998)), certif. denied, 190 N.J. 257 (2007). Our task is not to determine whether an alternative version of the facts has support in the record, but rather, whether "there is substantial evidence in support of the trial judge's findings and conclusions." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974); accord In re Tr. Created By Agreement, supra, 194 N.J. at 284. Legal conclusions, however, are reviewed de novo. Manalapan Realty v. Twp. Comm. of the Twp. of Manalapan, 140 N.J. 366, 378 (1995).

### III.

#### A.

The City first argues, as it did before the trial court, that the contract is illegal and violates public policy due to a conflict of interest created by plaintiff's employment of O'Reilly, the City's former Business Administrator. The City further contends that, even if O'Reilly abstained from working with the revaluation committee, "the potential for him to have influenced the process . . . was real." Plaintiff in turn submits there is no evidence in the record demonstrating that O'Reilly

14

influenced the committee in any way, and that O'Reilly had no divided interests either before or after he retired that would create a conflict of interest.

In rejecting the City's argument, the trial judge found that, while employed by the City, O'Reilly validly "recused himself from having anything to do with the revaluation, and made this public knowledge within City Hall." The judge elaborated:

> Every witness employed by [the City] and involved with the revaluation committee . . . testified clearly and unambiguously that O'Reilly was not present at any meeting, and had nothing to do with the revaluation.
>
> . . . .
>
> The evidence at the trial was overwhelming in that O'Reilly did, in fact, recuse himself, and had nothing to do with the City's revaluation process. It must be remembered that he retired in August of 2010, and the City did not even release its request for proposals until November of that year.
>
> The City's argument is that O'Reilly did impact the revaluation process by placing people of his own choosing on the City's revaluation committee before he retired. One such alleged example is John Mercer.
>
> The obvious fallacy in the City's argument is that the Business Administrator would clearly be a member of such a committee. By seeing to it that the Assistant Business Administrator took his place, O'Reilly was simply following through on the recusal.
>
> There's no evidence that O'Reilly affected Mercer, or that the substitution was

anything other than completely appropriate.

The policy underlying conflicts of interest law aims to ensure the public's confidence in the workings of the State. See Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., Dep't of Treasury, 99 N.J. 244, 249 (1985). "The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives. . . . Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled[.]" N.J.S.A. 40A:9-22.2(b)-(c). Public contract bidding evokes similar concerns. Indeed, we have noted that, "[b]oth the public interest and the public's perception that the bidding process is fair, competitive and trustworthy are critical components and objectives of our public bidding statutes." Muirfield Constr. Co., Inc. v. Essex Cty. Improvement Auth., 336 N.J. Super. 126, 137-38 (App. Div. 2000).

Pertinent to our analysis is the Local Government Ethics Law (LGEL), N.J.S.A. 40A:9-22.1 to -22.25. The LGEL provides, in pertinent part, that "[n]o local government officer or employee or member of his immediate family shall have an interest in a business organization or engage in any business, transaction, or professional activity, which is in substantial conflict with the

16                                    A-4339-15T1

proper discharge of his duties in the public interest[.]" <u>N.J.S.A.</u> 40A:9-22.5(a). The LGEL also provides that

> [n]o independent local authority[5] shall, for a period of one year next subsequent to the termination of office of a member of that authority: (1) award any contract which is not publicly bid . . . ; (2) allow a former member of that authority to represent, appear for or negotiate on behalf of any other party before that authority; or (3) employ for compensation . . . any former member of that authority.
>
> (Emphasis added.)
>
> [<u>N.J.S.A.</u> 40A:9-22.5(b).]

By its terms, <u>N.J.S.A.</u> 40A:9-22.5(a) applies only to <u>current</u> government officers. We recognized the statutory distinction between present and former public officials in <u>Cortesini v. Hamilton Twp. Planning Bd.</u>, 417 <u>N.J. Super.</u> 210, 217-18 (App. Div. 2010), <u>certif. denied</u>, 207 <u>N.J.</u> 35 (2011), noting "[m]ost provisions of [the LGEL] deal [only] with the ethical obligations of present government officers and employees."

The only subsection of the LGEL that imposes any restrictions on former employees is <u>N.J.S.A.</u> 40A:9-22.5(b). <u>Id.</u> at 218. Here, however, even if the revaluation committee is considered an "independent local authority" within the intent of subsection (b) (an issue we need not decide), O'Reilly clearly did not violate

---

[5] The term "independent local authority" is not defined in the statute.

this subsection. The committee awarded a contract that was publicly bid; O'Reilly was not involved in, nor did he appear on behalf of plaintiff with regard to, the price negotiations; and the committee did not employ O'Reilly for compensation.

Also relevant to the City's argument is its own "Revolving Door Ordinance," which was considered in the Matsikoudis opinion letter. As previously noted, the Ordinance generally prohibits former City employees, for a one-year period, from working for a company on a matter in which they: "[were] directly concerned;" "directly participated," or "had access to special knowledge or information" while employed by the City. Jersey City Municipal Code §33-1. However, the Ordinance specifically exempts former employees where, as here, the City's corporate counsel finds that the new employment satisfies the City's conflict of interest requirements and provides written approval. Jersey City Municipal Code §33-3.

The City contends that the Matsikoudis legal opinion letter cannot justifiably be interpreted as providing plaintiff and O'Reilly a "clean bill of health," as the trial court ruled. The City maintains that O'Reilly was "instrumental in the appointment of some if not all of [the committee members]." However, simply put, the City's contention is totally devoid of record support.

To the contrary, there is compelling evidence of O'Reilly's proper recusal in the entire revaluation process.

The City also cites the New Jersey Uniform Ethics Code, which was adopted by the State Ethics Commission pursuant to N.J.S.A. 52:13D-23, as another conflict of interest provision that O'Reilly violated. The Uniform Code provides in pertinent part:

> For one year after the termination of the State office or employment of any of the individuals noted above, he/she shall not represent, appear for, or negotiate on behalf of, or agree to represent, appear for, or negotiate on behalf of any person or party other than the State with or before any officer or employee of the State agency in which he/she served. The provisions of this subsection shall not apply to any partnership, firm or corporation in which he/she has an interest or is employed, or to any partner, officer, director or employee of such partnership, firm or corporation. Nothing contained in this section shall prohibit a State agency from contracting with a former State officer or employee to act on behalf of the State.
>
> [New Jersey Uniform Ethics Code, Feb. 2011, at p. 11.]

We do not find the City's reliance on the Uniform Code persuasive. By its express terms, it is limited to "state agencies," which the City and its revaluation committee are not. Moreover, plaintiff squarely falls within the Uniform Code's exception as a "partnership, firm, or corporation" that employed

19

O'Reilly, and hence is not barred under the Code from participating in the bidding process.

In sum, the record does not support the City's position that O'Reilly's employment with plaintiff created a conflict of interest. We find no basis to disturb the trial court's determination that O'Reilly had nothing to do with the entire revaluation process while employed by the City, which is supported by "adequate, substantial, and credible evidence" in the record. Rova Farms, supra, 65 N.J. at 484.

### B.

The City next contends the trial court misapplied applicable law and mistakenly exercised its discretion in upholding the validity of the contract despite plaintiff's non-conforming ownership disclosure statement. Plaintiff responds that the City failed to raise this issue in a timely fashion. Plaintiff further submits that any inaccuracy in its disclosure statement was the result of an innocent oversight and, under the circumstances, was not material to the bid award.

In its bid proposal, plaintiff included a "Corporation or Partnership Statement" as required by the RFP and N.J.S.A. 40A:11-4.4(d). N.J.S.A. 52:25-24.2, which is referenced in N.J.S.A. 40A:11-4.4(d), in turn provides:

> No corporation, partnership, or limited

> liability company shall be awarded any contract nor shall any agreement be entered into for the performance of any work . . . the cost of which is to be paid with or out of any public funds . . . unless prior to the receipt of the bid . . . there is submitted a statement setting forth the names and addresses of all stockholders in the corporation who own [ten] percent or more of its stock . . . or of all individual partners in the partnership who own a [ten] percent or greater interest therein[.]

Plaintiff in its ownership disclosure statement certified it had only two principals who held an interest of ten percent or more in the company, Stanley Rubenstein and Robert Rubenstein. Plaintiff contends this statement is inaccurate because, at the time plaintiff's proposal was submitted, Neil Rubenstein and Steven Rubenstein each owned 22.5% of the company. There is no indication, nor allegation, that this misrepresentation was intentional or attributable to anything other than an inadvertent oversight.

In its decision, the trial court rejected the City's position that plaintiff's failure to reference Neil and Steven Rubenstein's ownership interests mandated invalidation of the contract. Relying on Muirfield, supra, 336 N.J. Super. at 133, and Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 315 (1994), the court found the omissions were immaterial and of "no significance," stating:

The purpose of ownership disclosure is to make sure that criminals, untrustworthy people, individuals banned by law from doing government business, individuals involved in competitive bids on the same project, and individuals involved in a conflict of interest do not get the contract.

The names of Neil and Steve Rubenstein appear, literally, several dozen times in the proposal response.  Page 2 of Section 3.17 under company history specifically list[s] Steven and Neil as the only individuals actually managing the company.  It also points out that Stanley and Robert joined the company in 1951, nearly 60 years earlier.

The City knew very well it was [doing] business with Steve and Neil.  The City does not even suggest that if Steve and Neil were listed as owners that anything would have really resulted differently.  This is because there is nothing about them that would have disqualified them or changed anything.

The City nonetheless argues that the omission is non-waivable, and thus invalidates the contract.  This is not the law in New Jersey.

'The bidding noncompliance must be material in order to be fatal.'  Muirfield[, supra, 336 N.J. Super. at 133].

'A two-part test is used. First, whether the effect of the waiver would be to deprive the municipality of its assurance that the contract would be entered into, performed, and guaranteed according to its specific requirements and, second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders, or by otherwise undermining the necessary standard of competition.'  Meadowbrook,

22

> [s]upra, 308 N.J. at 315.

> Since the omissions were of no significance, the two-part test is clearly passed.

The issue thus presented is whether plaintiff's failure to comply completely with the ownership disclosure requirement, specified by the City as a term and condition of the negotiated proposal, is a material deviation that invalidates plaintiff's proposal, and therefore its contract. We conclude that, under the specific facts of this case, it is not.

The underlying purpose of N.J.S.A. 52:25-24.2 is "to ensure that all members of a governing body and the public be made aware of the real parties in interest with whom they are asked to contract." George Harms Constr. Co. v. Borough of Lincoln Park, 161 N.J. Super. 367, 372 (Law Div. 1978). Requiring bidders to fully disclose ten percent owners serves several purposes: it ensures that the governing body's members and the public are aware of the real parties in interest; it enables public officials to identify conflicts of interest before a public contract is awarded; and it provides public officials with the information necessary to assess the capability, financial stability, and moral integrity of bidders. Ibid.

We agree with the City that, generally speaking, a bidder's failure to completely disclose ten percent owners undermines the

purposes of the ownership disclosure statute and constitutes a material deviation that renders the offending bid proposal invalid. Nonetheless, in the present case, the statutory purposes were not frustrated as a consequence of plaintiff's oversight, as the trial court correctly concluded. The record makes clear that the City knew who plaintiff's owners were, and plaintiff made no effort to conceal their identities or their role in the management of the company or the revaluation project. Moreover, the City asserts no viable claim that plaintiff would not have been awarded the contract had its disclosure statement accurately listed Neil and Steven Rubenstein's respective ownership interests.

Importantly, also, the City did not raise the issue of plaintiff's inaccurate ownership disclosure statement until some six years after the contract was awarded, and not until after plaintiff had undertaken substantial performance. While the City argues that plaintiff secured an unfair advantage in the bidding process because it could have asserted this deficiency at any time to excuse its performance, there is no evidence to suggest that plaintiff ever intended or sought to do so. Rather, it is the City that belatedly attempted, for the first time at trial, to assert this deficiency as a means to invalidate the contract. Notably, the City did not reference the defective disclosure form

when it suspended the contract in June 2013, nor assert it as a defense in any pleading or its answers to interrogatories.

For similar reasons, we also reject the City's belated argument that the contract is invalid because plaintiff lacked the requisite qualifications to bid on it. Article III of the contract requires that the revaluation firm's "principals shall have five years of practical and extensive appraisal experience in the valuations of the four classifications of property." The City contends that Neil Rubenstein lacks the requisite qualifications to conduct appraisals of Class 4 properties, one of the four property classifications, and that the contract should be voided on this basis.

The City's argument is unpersuasive. First, in his trial testimony, Neil Rubenstein never confirmed nor denied whether he possessed the qualification to appraise Class 4 properties. The City has offered no competent evidence of Neil Rubenstein's alleged lack of qualification. More importantly, however, the court barred this evidence during the City's case, along with the evidence concerning the omission of the names of Neil and Steven Rubenstein as ten percent owners, due to the City's failure to timely raise these issues and the resulting prejudice its admission would cause plaintiff. Instead, the court allowed the evidence solely for impeachment purposes. We accord substantial deference to the

trial judge's discretion on evidentiary rulings, <u>Benevenga v. Digregorio</u>, 325 <u>N.J. Super.</u> 27, 32 (App. Div. 1999), <u>certif. denied</u>, 163 <u>N.J.</u> 79 (2000), and reverse only where the judge's ruling was "so wide of the mark that a manifest denial of justice resulted." <u>State v. Carter</u>, 91 <u>N.J.</u> 86, 106 (1982). We discern no abuse of discretion here.

C.

The City next argues that two post-bid modifications to the contract render it invalid. In considering this contention, we recognize that bidders, as well as the public entities that solicit bids, are generally bound by the express terms of the bid proposal. <u>Suburban Disposal, Inc. v. Twp. of Fairfield</u>, 383 <u>N.J. Super.</u> 484, 492 (App. Div. 2006). "[A]ll bids must comply with the terms imposed, and any material departure invalidates a nonconforming bid as well as any contract based upon it." <u>Meadowbrook</u>, <u>supra</u>, 138 <u>N.J.</u> at 314 (citations omitted). On the other hand, discrepancies that are "minor or inconsequential" do not qualify as material. <u>CFG Health Sys., LLC v. Cty. of Hudson</u>, 413 <u>N.J. Super.</u> 306, 315 (App. Div. 2010).

The first post-bid modification cited by the City pertains to the photograph requirement. Section 4.6 of the RFP (Photograph Requirements) states, in pertinent part:

>     The revaluation of all properties must

26

include a minimum of two (2) color digital photographs, front and rear, of each parcel/line item of real property in the City.

Since a sufficient number of photographs must be taken to review a complex completely, a front/side photograph must be taken of every structure on commercial and exempt properties.

Photographs of all vacant parcels are required.

. . . .

Furthermore, the Firm shall take additional digital color photographs necessary to identify and substantiate the value of a significant or unique valuation attribute, characteristic or feature, including accessory structures, that exists on a property that has a substantial positive or negative influence on the valuation of said property. Said photographs shall be properly and correctly identified.

The contract, on the other hand, provides only that "[a] digital color photograph shall be taken of the main improvements on each lot."

Having reviewed the record, we conclude that this contractual amendment was not a "vehicle for corruption or favoritism," nor did it discourage or inhibit the fair bidding process in any meaningful way. See Meadowbrook, supra, 138 N.J. at 314-15. Rather, relying on CFG Health, supra, 413 N.J. Super. at 315, the trial court properly determined that the amendment to the photograph requirement was relatively "minor and inconsequential,"

27

and noted it actually benefitted both parties, that the City agreed to the bid amendment in the contract, and that the amendment made practical sense.

The second discrepancy concerns the appraisal manual used in the valuation process. The RFP provides:

> If the Cost Approach is applicable, the Marshall Swift Valuation Service shall be utilized in estimating the value. In addition, the Firm shall supply a valid copy and [a] one (1) year subscription of the Marshall Swift Commercial Estimator Software program to the City Tax Assessor for his use.

The Contract incorporated this requirement from the RFP and directed that "[t]he Marshall-Swift Valuation manual will be utilized for the cost approach of class 4 properties." The contract added, "[t]he use of any other appraisal manual for valuing real property shall require approval by the Director of Taxation." Subsequently, on April 26, 2011, the parties executed an addendum to the contract that provided:

> In accordance with the Division of Taxation revaluation approval, dated March 18, 2011, the contract shall be amended to provide that the Real Property Appraisal Manual for New Jersey Assessors, Third (3rd) Edition, will be used for both residential and class 4 properties (commercial, industrial and apartment) instead of the Marshall Valuation Services, which is in the current contract for class 4 properties.

In its April 14, 2016 oral decision, the court rejected the

City's argument that the addendum was an improper post-bid modification that served to invalidate the Contract. The court reasoned:

> Regarding the cost approach, there are two different methodologies. One is found in the Marshall Swift publication, and the other is found in the Real Property Appraisal Manual for New Jersey.
>
> The RFP required that the Marshall Swift publication be followed. The contract, I believe it was Section E of Article 5, Paragraph 3, said that any other manual will [require] the approval of the Division of Taxation.
>
> When the Division of Taxation approved the contract on March 8[], 2011, the acting director attached to the approval letter the following addendum:
>
> "Please be reminded that the latest costs schedules and corresponding cost conversion factors of the Real Property Appraisal Manual for New Jersey Assessors, third edition, must be used for all reassessments and revaluations."
>
> Based upon the clear, and unambiguous order from the acting director, the contract was amended on April 26[], 2011, that addendum signed by [Neil] Rubenstein and Ed Toloza, the Tax Assessor for Jersey City.
>
> Similar to the attempted renunciation of its Corporation Counsel, the City now renounces its Tax Assessor's act in following the order of the acting director. The [c]ourt views this argument as merit[]less.

We further note that Michele Hennessey, who drafted the RFP on behalf of the City, testified that she was directed by Michael Bryant, the Director of the Division of Taxation, to enter into the April 26, 2011 addendum. This was because the Division of Taxation had previously ruled "that [the] Marshall and Swift [manual] would no longer be used for evaluating Class 4 properties." Accordingly, we find the record amply supports the trial court's conclusion that use of the amended appraisal manual does not invalidate the contract.

### D.

The City agrees that the trial court properly concluded that it constructively invoked the termination for convenience clause when it suspended work under the contract on June 25, 2013. The City asserts, however, that it did not act with the intent to harm plaintiff, and for that reason the trial court erred in finding that it terminated the contract in bad faith. Plaintiff in turn contends the termination for convenience clause does not limit its damages because the City never invoked it, and that the trial court's finding of bad faith is supported by the record and applicable case law.

A termination for convenience, whether constructive or otherwise, limits a contractor's recovery to costs incurred, a

A-4339-15T1

reasonable profit for the work performed, and termination costs. Best Foam Fabricators, Inc. v. United States, 38 Fed. Cl. 627, 637 (1997). We addressed the validity of a termination for convenience clause in Capital Safety, Inc. v. State, Div. of Bldgs. & Constr., 369 N.J. Super. 295 (App. Div. 2004). Drawing guidance from federal case law, we stated:

> The federal courts have broadly construed termination for convenience provisions to authorize termination for any reason that is in the best interests of the government so long as the contracting agency does not act in bad faith. Mere error on the part of the Government, even if it would constitute sufficient ground for contractual breach were the termination clause inapplicable, is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience. In fact, the federal courts have indicated that in the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.

> The federal courts have also held that the contractors' burden to prove the Government acted in bad faith . . . is very weighty. Government officials are presumed to act in good faith, and it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing. The requirement of well-nigh irrefragable proof . . . sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith. This standard has been equated with evidence of some specific intent to injure the plaintiff. Consequently, an ordinary business decision made for the purpose of saving the government money does not provide

a basis for a finding of bad faith. Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith.

Our Supreme Court has also recognized that if a breach of contract claim requires a showing of bad faith, a party may not be held liable for simply exercising its discretionary authority under the contract for ordinary business purposes--reasonably within the contemplation of the parties. To show bad faith, the claimant must establish that the alleged breaching party had an improper motive. Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.

[Id. at 300-01 (internal citations and quotation marks omitted).]

In the present case, the trial court found "no clear precedent" allowing constructive application of the termination for convenience clause. Ultimately, the court constructively invoked the clause, essentially "because New Jersey does recognize termination for convenience clauses, especially in government contracts." Notwithstanding, the court concluded the City terminated the contract in bad faith, reasoning:

Based on the evidence in this case, the [c]ourt finds that the reasons given in the Mayor-elect's letter[6] halting the contract

---

[6] We note for the record that when Steven Fulop sent this letter to the City Business Administrator, he was only a City Councilmember. Although Fulop signed the letter as "Mayor-elect," this title has no legal significance. It merely denotes the status

were clearly pretextual. There was no investigation into how the awarding of the contract was reviewed. There was no investigation of the impact of Superstorm Sandy on the revaluation, or the amount of time involved, or the methodology used in the performance by plaintiff.

The testimony of many witnesses, including many [of the City's] employees who were involved in the revaluation and would surely have been contacted for any such investigation, shows there was no such investigation.

As to the alleged conflict of interest[,] [t]he City knew from the very beginning, from its own Corporation Counsel that there was no conflict of interest. The City's arguments at trial regarding O'Reilly's placing of people on the committee were essentially frivolous.

Most compelling of all, however, is the inexplicable position of the City, even as of this moment, not to follow what it knows to be the correct, legal, and constitutional mandates and finally have the revaluation.

The [c]ourt is aware that government officials are presumed to act in good faith, and that [] well nigh irrefragable proof is necessary to abandon that presumption.

The evidence in this trial is clear and convincing. The City simply does not want a revaluation, period. Considering [the City's] status as having, literally, one of the most unfair tax distribution burdens in the entire State, coupled with how long overdue the

---

of a candidate who prevailed in the municipal election, but has not yet taken the oath office necessary to assume the legal powers associated with office of Mayor.

> revaluation was and still is, this intransigence certainly constitutes an improper motive.
>
> In order to pursue this improper position, the City knew that it would have to harm an innocent party, that being [plaintiff], who is simply doing the job it was hired to do.

Having reviewed the record, we conclude that the trial court's ruling represents a well-reasoned application of the controlling law to the evidence presented at trial. Accordingly, we find no basis to disturb it.

E.

We next address the City's challenges to the damage award. First, the City contends that expectation damages were not within the contemplation of the parties, and plaintiff could not reasonably expect to earn profits for work not completed. In support of this argument, the City cites the boldfaced clause in the RFP that states: "[i]t is important to note that pursuant to N.J.S.A. 40A:5-16, the City is prohibited from paying for goods or services before they have been provided." However, the City conveniently omits the next sentence: "Therefore, any proposals which specify payment upon contract signing will be deemed unresponsive and rejected."

The City clearly misconstrues the purpose of the Local Fiscal Affairs Law, N.J.S.A. 40A:5-1 to -50, upon which its argument is

based.  It is clear from the plain text of N.J.S.A. 40A:5-16 that the law is intended to guard against preemptive, anticipatory payments to contractors by public entities, rather than to serve as a limitation on damage awards.

Next, the City asserts that the trial court's method of calculating lost profits was erroneous and resulted in a windfall to plaintiff.  The City cites Goldman v. Shapiro, 16 N.J. Super. 324 (App. Div. 1951), to support its position.  In Goldman, the panel stated, in dicta, that "when a contractor has been prevented from [complete] perform[ance] . . . the measure of . . . damages is generally[] for the work actually performed[.]"  Id. at 327. The City contends the trial court did not properly apply the Goldman formula, as it did not make any findings as to the percentage of the revaluation project that plaintiff completed. We do not find this argument persuasive.

In Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1 (2007), our Supreme Court set forth the principles that inform any award of contract damages.  As a threshold matter, the Court explained that "[j]udicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance."  Id. at 12 (citation and internal quotation marks omitted).  The Court noted that

[e]ach of these contract remedies serves a different purpose. Restitution returns the innocent party to the condition he or she occupied before the contract was executed. Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed. Performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement.

[Id. at 12-13 (citation omitted).]

The Court further observed that, "[m]ost often, courts award compensatory damages in a breach of contract action" and that "[t]he extent of a damage award, and its connection to the breach, has its origins in English Common Law, arising from the seminal decision in Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 (1854)[.]" Id. at 13 (citations omitted).

Here, basic principles of contract law control. First, "'[u]nder contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract.'" Ibid. (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)). Second, "the goal is 'to put the injured party in as good a position as if performance had been rendered.'" Ibid. (editing marks omitted) (quoting Donovan v. Bachstadt, 91 N.J. 434, 444 (1982)). Third, "in order to be compensable, 'the loss must be a reasonably certain consequence of the breach, the exact amount of the loss need not be certain.'" Id. at 14 (editing

marks omitted) (quoting Donovan, supra, 91 N.J. at 445). Fourth, "mere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief." Ibid. Finally, "'[p]roof of damages need not be done with exactitude[.]'" Ibid. (alteration in original) (quoting Lane v. Oil Delivery Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)). Those damages may include lost profits, so far as they can be determined with a "reasonable degree of certainty." Stanley Co. of Am. v. Hercules Powder Co., 16 N.J. 295, 314 (1954) (citations omitted).

Guided by these principles, after ruling that the City had breached the contract in bad faith, the trial court correctly determined that plaintiff was "entitled to the normal measure of damages which is lost profits." Neil Rubenstein presented proofs supporting plaintiff's damage claim, and the court found his testimony credible. We discern no basis to disturb the method or manner by which the court calculated the damage award.

F.

Finally, the City contends the trial court erroneously quashed trial subpoenas it issued to telecommunications and internet service providers seeking records regarding communications between O'Reilly and plaintiff while O'Reilly was employed as the City's Business Administrator. The City maintains that the subpoenas were relevant to O'Reilly's credibility, and

that the trial court abused its discretion in quashing them. The trial court noted that the documents sought by the City could have been obtained during pre-trial discovery. It further determined that the questionable relevance of the documents was outweighed by the delay that would ensue from enforcement of the subpoena. See N.J.R.E. 403. Having reviewed the record, we find the City's challenge to the trial court's decision to quash the subpoenas lacks sufficient merit to warrant additional discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION