**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0385-22
A-0386-22

DIVYAJIT MEHTA and DGNS CORP.,

    Plaintiffs-Respondents/Cross-
    Appellants,

v.

EMANUEL HEDVAT, AMERICAN
ANALYTICAL ASSOCIATION, INC.,
NJ CUBIC 29, LLC, 29 COTTAGE
STREET, LLC, CHEMTECH GROUP,
LLC, and EFJ REALTY LLC,

    Defendants-Respondents,

and

FARIBA HEDVAT,

    Defendant-Appellant/Cross-
    Respondent,

and

CHEMTECH CONSULTING GROUP,
INC., MOUNTAINSIDE REALTY, LLC,
and VIRTUAL INSTITUTE
PERSONNEL, LLC,

Defendants/Third-Party Plaintiffs-
Respondents,

v.

ARECON LTD. and GAYATRI MEHTA,

Third-Party Defendants-
Respondents/Cross-Appellants.

_____

DIVYAJIT MEHTA and DGNS CORP.,

Plaintiffs-Respondents/Cross-
Appellants,

v.

EMANUEL HEDVAT, AMERICAN
ANALYTICAL ASSOCIATION, INC.,
NJ CUBIC 29, LLC, 29 COTTAGE
STREET, LLC, CHEMTECH GROUP,
LLC, and EFJ REALTY LLC,

Defendants-Appellants/Cross-
Respondents,

and

FARIBA HEDVAT,

Defendant-Respondent,

and

CHEMTECH CONSULTING GROUP,
INC., MOUNTAINSIDE REALTY, LLC,

2

and VIRTUAL INSTITUTE
PERSONNEL, LLC,

       Defendants/Third-Party Plaintiffs-
       Appellants/Cross-Respondents,

v.

ARECON LTD. and GAYATRI MEHTA,

       Third-Party Defendants.

_____

       Argued March 25, 2025 – Decided September 4, 2025

       Before Judges Smith and Vanek.

       On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000135-20.

       Eric D. Reiser argued the cause for appellant/cross-respondent in A-0385-22 (Shapiro Croland Reiser Apfel & Di Iorio, LLP, attorneys; Eric D. Reiser, of counsel and on the briefs).

       Rubin M. Sinins argued the cause for appellants/cross-respondents in A-0386-22 (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, attorneys; Rubin M. Sinins, of counsel and on the briefs).

       Michael J. Cohen argued the cause for respondents/cross-appellants Divyajit Mehta and DGNS Corp. (Winne, Banta, Basralian & Kahn, PC, and Harlan M. Lazarus (Lazarus & Lazarus, PC) of the New York Bar, admitted pro hac vice, attorneys; Michael J. Cohen and Harlan M. Lazarus, of counsel and on the briefs).

3

PER CURIAM

These appeals, calendared back-to-back and consolidated for purposes of issuing a single opinion, stem from a contentious dispute between business partners. After a bench trial, both parties appeal the order of the Chancery Division finding that defendants Emanuel Hedvat and Fariba Hedvat, along with numerous companies that they controlled, diverted over $2.8 million from businesses shared with plaintiffs Divyajit Mehta and DGNS Corp (DGNS). The trial court found that defendants were liable for breach of contract, breach of the covenant of good faith and fair dealing, conversion, and unjust enrichment.

Fariba appealed separately under docket A-385-22, and the remaining parties appealed under docket A-386-22. On appeal, Fariba argues that the trial court should have dismissed her from the action either on summary judgment or at trial. All defendants, including Fariba, argue that the court erred when: it found them liable; included a transaction outside the statute of limitations; admitted certain expert testimony; determined that joint and several liability applied; and awarded attorney's fees and costs. In cross-appeals under both dockets, Mehta and DGNS allege that the court erred when it declined to award prejudgment interest for each transaction linked to a misappropriation.

We affirm for the reasons which follow.

4

I.

A.

*Background*

We gather the relevant facts from the record, including evidence adduced during the twenty-two-day bench trial. In 1984, Mehta, a chemical engineer from India, began working for Chemtech Consulting Group, Inc. (Chemtech), a company that analyzed samples from contaminated environmental sites. Emanuel, then Chemtech's laboratory manager, hired him, and over the ensuing years, the two developed a friendship and business relationship. Mehta rose through the ranks at Chemtech to become the laboratory manager, while Emanuel ascended to become Chemtech's sales and marketing manager. In 1990, Mehta and Emanuel, along with other investors, purchased Chemtech. By 2007, all other investors had sold their interests to Mehta and Emanuel, leaving them sole shareholders and co-owners of Chemtech.

During this period, Emanuel and Mehta each formed and operated other businesses, both individually and together. Emanuel created A3I, an environmental data analysis company. His wife, Fariba, was the sole shareholder of A3I. Mehta's wife, Gayatri, formed DGNS, a company which validated environmental laboratory data and was still in business at the time of

trial. Mehta was DGNS's authorized agent. Neither A3I nor DGNS were connected to Chemtech. In fact, the two businesses jointly owned a company called Chemtech LLC, an environmental laboratory business, with Minority Business Enterprise status. A3I and DGNS also formed Mountainside Realty, LLC (MRL). MRL acquired, operated and managed real estate, including properties that served as headquarters, office, and lab space for Chemtech. MRL also owned other business entities related to the parties, including Cubic, 29 Cottage, and VIP. VIP was a business entity that processed payroll for Emanuel and Mehta's virtual employment company in India. EFJ Realty was an entity that Emanuel created with Fariba which owned various real estate exclusively for A3I.[1]

## B.

*The Agreements and Transactions at the Heart of the Dispute*

There were multiple shareholder and employment agreements between the parties which defined the parties' obligations to each other concerning their

---

[1] There were several companies with names similar to EFJ which were owned by Mountainside Realty. For example, Mountainside was the owner of EFJ 240 Prospect LLC; EFJ 70 East Passaic, LLC; and EFJ 275 Grand, LLC. EFJ 240 Prospect LLC owned a property located at 240 Prospect Street in Maywood. EFJ 70 East Passaic, LLC, owned the building located at 70 East Passaic Street in Maywood. EFJ 275 Grand, LLC, owned the property at 275 Grand Avenue, Leonia.

A-0385-22

business affairs. In 2000, Fariba, on behalf of A3I, and Gayatri, on behalf of DGNS, executed the Mountainside Realty Operating Agreement (MRL agreement). In the MRL agreement, DGNS and A3I agreed to share all capital contributions, profits, and surplus related to MRL. Concerning profits, the MRL agreement stated that all profits were to be shared according to the percentage of interest each member owned. It also specified that "[n]o member shall make any withdrawals from capital without prior approval of [MRL]". Concerning the maintenance of the financial books and records, "[e]ach of the parties . . . covenants and agrees to cause all known business transactions pertaining to the purpose of [MRL], to be entered properly and completely into [the MRL company] book". The MRL agreement also contained an indemnification provision which stated that members "shall also indemnify the other members from any and all claims, demands and actions of every kind and nature whatsoever which may arise out of or by reason of such violation of any terms and conditions of [the agreement]."

On January 1, 2007, Mehta signed an employment agreement with Chemtech to serve as Chemtech's Chief Operating Officer (COO) at an annual salary of $300,000. Emanuel countersigned the agreement on behalf of Chemtech as the President. Also on January 1, 2007, Emanuel signed an

A-0385-22

employment agreement with Chemtech to serve as company president for $300,000 annually. Mehta countersigned the agreement on behalf of Chemtech as the COO.

Seven months later, on July 1, Mehta and Emanuel signed the 2007 Chemtech Shareholder Agreement (CSA), effective July 16. As per the CSA, Mehta held a fifty-one percent interest in Chemtech and Emanuel held a forty-nine percent interest. The CSA stated that "[a]ll decisions regarding the operation of the business of [Chemtech] and the expenditure of the funds thereof shall be made by majority vote of the Stockholders." The CSA further stated that Emanuel and Mehta, as shareholders, were directors of Chemtech. The CSA also stated that each officer of Chemtech "shall also be a Shareholder of [Chemtech], and that the offices of Chairman of the Board, President, Secretary, and Treasurer shall only be filled by Stockholders." Emanuel held the title of President of Chemtech, while Mehta held the title of Secretary.

During this period, Mehta handled lab operations and technical as well as Minority Business Enterprise compliance at Chemtech, while Emanuel handled business, marketing, and accounting operations. Emanuel also controlled Chemtech's major financial records, checkbooks, and QuickBooks accounts. Chemtech's business and finance affairs were informally managed by Emanuel,

A-0385-22

with Mehta involved in certain approvals. Both parties used the same accountant, Sandy Meyers, who also provided accounting services to the related business entities.

During 2013 and early 2014, Emanuel proposed a buyout to Mehta, suggesting that one partner buy out the other's interest in Chemtech, Mountainside, and related assets. Emanuel presented Mehta with financial spreadsheets and documents purporting to show valuations for the various business and real estate assets. The documents showed that Chemtech's value was $1,192,363.52. By applying a multiplier of three, Emanuel reached a final valuation of approximately $3.6 million. Mountainside, along with its subsidiary Cubic, had a total value of about $8.4 million, leading to a total asset value of $12.1 million dollars. Thus, according to the presented documents, Metha's total interest in MRL, Chemtech, and Cubic was approximately $5.9 million. During the summer of 2014, Emanuel proposed to buy out Mehta for a total of $5.6 million, then increased his proposal to $5.7 million. Ultimately, the offer rose to approximately $6.3 million. The parties did not reach agreement at that time.

On November 4, 2014, Mehta executed a second employment agreement with Emanuel, who countersigned the document as the President of Chemtech.

A-0385-22

Mehta agreed to work for Chemtech as COO for an additional three years at an annual salary of $120,000, ending on October 31, 2017.

On December 5, 2014, Gayatri and Emanuel executed a Membership Interest Purchase Agreement (MIPA) through which DGNS sold its interest in MRL to A3I for $4,960,000, effective January 1, 2015. Gayatri signed as the President of DGNS and Emanuel signed as the President of A3I. The MIPA noted that DGNS and A3I each owned fifty percent of Mountainside, and listed MRL's subsidiary companies, including Cubic; 29 Cottage; EFJ 240 Prospect, LLC; EFJ 70 E Passaic LLC; and EFJ 275 Grand, LLC. The sales agreement listed Mountainside's primary assets as the real estate at 29 Cottage Street, 240 Prospect Avenue, 70 East Passaic Street, 275 Grand Avenue, 724 Undercliff Avenue in Edgewater, 1151 Glen Avenue in Fort Lee, and 284 Sheffield Street in Mountainside.

Section 5.5 of the MIPA was entitled "Personal Guaranties." It specified that A3I, as buyer, "shall indemnify and hold [DGNS] harmless from any claims made by any of [MRL's] Lenders with respect to such personal guaranties as set forth in the Indemnification Agreement." In the MIPA, there were indemnification clauses for both the buyer and the seller. As to indemnification of DGNS, A3I agreed to:

indemnify and hold harmless [DGNS], and will pay to [DGNS] the amount of any Damages, arising out of, resulting from, or relating to: (a) any material inaccuracy or breach of any representation or warranty of [A3I] contained in this Agreement or in any other document delivered by [A3I] as required by this Agreement; (b) any material breach or violation of the covenants or agreements of [A3I] contained in this Agreement or in any other document delivered by [A3I] as required by this Agreement; (c) one-half of any taxes of [MRL] (but not any personal taxes of [DGNS]) with respect to any tax paid prior to the Effective Date; and (d) one-half of any costs and expense of [MRL] through the Effective Date.

Further, attached to the MIPA was a personal indemnification agreement signed by Emanuel, President of A3I, as the indemnitor. The purpose of this Exhibit was to indemnify Mehta and Gayatri in connection with certain monies A3I planned to borrow from TD Bank and Bank of America to purchase DGNS's interest in MRL. As to indemnification, Exhibit C stated:

Indemnitors shall jointly and severally defend, indemnify, and hold Indemnitees harmless from and against, and shall pay to Indemnitees the amount of, or reimburse Indemnitees for, any and all obligations, costs, fines, claims, actions, injuries, demands, suits, judgments, settlements, amounts paid, proceedings, investigations, arbitrations and reasonable expenses, including reasonable attorney's fees and expenses, that Indemnitees may suffer, sustain, or become subject to, as a result of, in connection with, or relating to (a) any default or breach on or after the date of this Agreement of the loan documents with [MRL's] lenders or (b) the

> personal guarantees of the Indemnitees to [MRL's] lenders.

The indemnification agreement also permitted a claim for reasonable attorney's fees for the prevailing party in a lawsuit to enforce or interpret the agreement in addition to other relief that may be awarded by a court. In the assignment of membership interest, another document attached to the MIPA, Emanuel signed as the Secretary of A3I. This document appointed Emanuel as the attorney-in-fact to transfer the membership interest from DGNS to A3I, and it noted that A3I would then own one hundred percent of Mountainside.

Additionally, on December 5, Emanuel and Mehta signed the 2014 Stock Purchase Agreement (2014 SPA) through which Mehta sold his interest in Chemtech to Emanuel. The 2014 SPA assigned fifty-one percent of ownership to Mehta and forty-nine percent ownership to Emanuel. The purchase price of Mehta's shares was $740,000. The terms of the agreement called for Mehta to receive a payment of $400,000 upon signing the SPA, then $300,000 on July 1, 2017, and $40,000 at closing on December 31, 2017. The 2014 SPA stated that "[a]ll representations and warranties contained in Sections 3.1 [Mehta's representations and warranties], 3.2 [Emanuel's representations and warranties] and 4.1 [capitalization] through 4.2 [non-contravention] shall survive the closing and continue indefinitely".

A-0385-22

Further, Section 8.3, entitled "Personal Guarantees," stated:

> [Chemtech] and [Emanuel] shall use commercially reasonable efforts to cause all creditors to release [Mehta], on the Closing Date, from any and all personal guaranties of any loans, credit lines or other credit extended to [Chemtech]. Until [Chemtech] and [Emanuel] cause such creditors to release [Mehta] from any such personal guaranties, [Chemtech] and [Emanuel] shall jointly and severally indemnify and hold harmless [Mehta] from and against any and all losses, costs, damages (including incidental and consequential damages), liabilities or expenses (including court costs, reasonable attorney's fees, interest expenses and amounts paid in compromise or settlement), suits, actions, claims, obligations, fines, penalties or assessments (collectively, "Losses") arising out of any such personal guaranties.

The 2014 SPA also contained a personal indemnification from Emanuel to Mehta. It stated:

> [Emanuel] agrees to indemnify and hold harmless [Mehta] from and against any and all Losses incurred by [Mehta] after the date of this Agreement and arising out of, resulting from, or relating to (i) any material inaccuracy or breach of any representation or warranty of [Emanuel] contained in this Agreement, (ii) any material breach or violation of the covenants or agreements of [Emanuel] contained in this Agreement and (iii) any material inaccuracy in any certificate, instrument or other document delivered by [Emanuel] as required by this Agreement.

During the period from 2014 to December 2017, Mehta continued to run the laboratory side and Emanuel continued to run the financial side of Chemtech.

13

Before December 31, 2017, the parties changed the terms of the 2014 SPA. Fariba was substituted for Emanuel as the buyer so that the business could qualify as a woman-owned business enterprise. This substitution resulted in a modified SPA (the 2017 SPA), identical in all terms except for the buyer substitution. Mehta received the payments agreed upon in the SPA and ended his employment with Chemtech in December 2017 as agreed upon.

In April 2019, Mehta and his wife received a tax deficiency notice, stating they owed roughly $100,000 to the State of New Jersey (the State) in connection with DGNS's 2014 sale of its interest in MRL. Mehta retained an accountant, Hemant Prajapati, to investigate the matter. Prajapati discovered an irregularity in the 2014 transaction and requested more records. Myers and Emanuel suggested to Mehta that the delinquent tax notice was a result of an error on the tax return. They proposed that Mehta recharacterize certain MRL transactions originally classified as membership interest to asset sales. After Prajapati heard Myers' and Emanuel's proposal, he became concerned that such a change would constitute tax fraud. Although Myers sent a letter to the State claiming that a distribution allocated to DGNS and A3I should have been made solely to A3I, thereby negating the tax issue, the State did not refund any money to Mehta.

14

Meanwhile, Emanuel failed to disclose the full financial records for MRL, Cubic, and VIP despite Mehta's requests. After reviewing limited records for MRL, Cubic, and VIP, Prajapati determined that there were $2.1 million in accounting errors. Additionally, Emanuel provided Mehta with limited Chemtech tax returns. Mehta's review of the Chemtech tax returns showed that Emanuel never distributed certain retained earnings to him, even though Mehta paid taxes on them. By fall 2019, Emanuel had not turned over the requested documentation to Mehta and Prajapati, despite repeated written demands.

On January 17, 2020, having not received all the requested records from Emanuel, Mehta and DGNS filed a complaint against Emanuel, Fariba, Chemtech, MRL, and A3I in the Chancery Division. The initial complaint demanded an accounting, sought damages and restitution, requested a constructive trust, and alleged conversion, breach of contract, fraud in the inducement, and breach of the covenant of good faith and fair dealing. After the complaint was amended, defendants answered, counterclaimed, and filed a third-party complaint against: Pharmachem Laboratories and Arecon Ltd., companies owned by Mehta; Gayatri; and Myers, the accountant.[2] On

---

[2] Myers and Pharmachem Laboratories both settled before trial, but neither settlement is included in the record.

A-0385-22

September 16, 2021, plaintiffs again amended their complaint to include Cubic, 29 Cottage, VIP, Chemtech LLC, and EFJ Realty as additional defendants. Plaintiffs alleged that Cubic, 29 Cottage, VIP, Chemtech LLC, and EFJ were entities owned or controlled by Fariba and Emanuel. Discovery was contentious, with significant disputes between the parties over access to and production of financial records.

Prior to trial, the court denied defendants' motion to bar or limit plaintiffs' expert's testimony. The court granted in part and denied in part defendant's motion for summary judgment. The trial court granted summary judgment on the question of whether Mehta was entitled to what he alleged was unpaid compensation. The court denied summary judgment on other issues, finding there were genuine issues of material fact on plaintiffs' other claims, including the fraud claims. The court also denied summary judgment on defendants' argument that plaintiffs' claims should have been brought derivatively.

C.

*The Trial*

The bench trial commenced on January 18, 2022, and took place over twenty-two non-consecutive days, concluding on March 17, 2022. During trial, the court denied defendants' motion for a directed verdict pursuant to Rule 4:40-

16

1 and denied plaintiffs' motion to dismiss defendants' counterclaim and third-party complaint. On June 30, 2022, the court found in favor of plaintiffs.

The court reviewed the record, including witness testimony and exhibits, and made findings. Among other things, the court found: Emanuel's corporate role was to run Chemtech and manage the books, while Mehta's corporate role was as a scientist; that Emanuel engaged in fraudulent activity, which he attempted to cover up; and that Emanuel did not turn over all the financial data Mehta requested. The court found plaintiffs' expert Prajapati credible, having examined potentially thousands of transactions. The court, however, did not agree with his conclusion that plaintiffs' damages were $10 million. The court accepted defense expert Henry Fuentes's testimony that it was not proper to sum all of the problematic transactions up and add them to the purchase price of the buyout to calculate damages. However, the court rejected Fuentes's remaining analysis, finding it "cursory." The court found that Fuentes could not explain how monies ended up in accounts that were controlled by defendants. Rather, the court found credible and accepted Prajapati's explanation that there were conduit accounts, commingling, and step transactions that were used to divert money to defendants without plaintiffs' knowledge.

A-0385-22

The court also found instances where Emanuel stated that Mehta was given money, such as cash from rents associated with MRL, but there was no documentation supporting that Emanuel had actually paid the money to Mehta. Also, evidence showed there were conduit accounts which diverted money from MRL's books, and unauthorized management fees processed through EFJ Realty. Duplicate payroll expenses were run through Chemtech LLC and other artificial losses also were attributed to Chemtech LLC. Further, evidence showed that defendants had diverted money from Chemtech to Chemtech LLC. The court found many of these transactions troubling and without sound explanation.

The court identified transactions which the evidence showed represented diverted income: Chemtech funds diverted to a third-party entity controlled by Emanuel, followed by a transfer from that same third-party entity to A3I in the amount of $629,217.85; $2 million diverted from MRL on December 26, 2008, by Emanuel to his personal account; $500,000 diverted from MRL's account in November 2013 to a personal account belonging to Emanuel; $75,000 on August 22, 2014, from MRL to A3I; $2.3 million on November 26, 2014, from MRL to A3I, where Emanuel used MRL funds to buy DGNS's interest in MRL as set forth on schedule twenty-one of Prajapati's expert report; $50,000 on December

18

5, 2014, diverted into an account for A3I from Chemtech's line of credit; $50,000 on September 8, 2015 from MRL to an account maintained by Emanuel and Fariba; $90,000 on October 7, 2015 to an account belonging to Emanuel and Fariba; $50,000 on October 28, 2015 from Chemtech's account to A3I; and $106,490 in unauthorized management fees.

For the above transactions the record shows the court found no evidence that similar distributions went to plaintiffs. The court tallied the diverted amounts and divided the sum by two, awarding compensatory damages to plaintiffs in the amount of $2,882,244.85. The court rejected plaintiffs' punitive damages claim. The court further declined to order an accounting of all entities in the lawsuit, dismissing counts one and two. The court also declined to place all of Emanuel's assets into a constructive trust, dismissing counts three and four. The court dismissed counts nine and ten, because the damages calculation plaintiffs sought was for the court to add the diverted funds to the purchase price.

The court next found defendants liable under plaintiffs' conversion theory, determining that defendants engaged in the unauthorized assumption and exercise of the right of ownership of monies belonging to plaintiffs. The court rejected defendants' derivative suit argument, finding the facts represented an exception to the rule that a derivative suit was required, because of the special

19

relationship between Mehta and Emanuel as corporate officers of a closely held corporation. The court found that Mehta should have received whatever Emanuel received from Chemtech, but that did not happen.

The court next found A3I and Fariba breached their obligations under the MRL Operating Agreement, because Emanuel, as A3I President, made capital withdrawals from MRL without approval and authorization from plaintiffs. Plaintiffs received no distribution from funds funneled to A3I and various accounts shared between Fariba and Emanuel. Concerning the 2017 SPA, the court found Emanuel used company funds without authorization and failed to distribute profits. The court also found that plaintiffs proved by a preponderance of the credible evidence that defendants' actions violated the covenant of good faith and fair dealing in both contracts.

The court also found plaintiffs met their burden of proof on their unjust enrichment claim, noting that "Mehta was shortchanged on certain monies." The court did not award all the damages plaintiffs requested, stating that it discounted much of the relief plaintiffs requested based on lack of proof. It also explained that the diverted funds led to an unjust enrichment, plaintiffs had proven that defendants received a benefit, and the retention of those benefits was unjust.

The court found the counterclaim and third-party complaint meritless, finding those actions were brought as retaliation for plaintiffs' lawsuit. The court also denied defendants' post-trial motion to modify the judgment, again finding Mehta and Prajapati credible.

The court next found defendants were jointly and severally liable in the amount of $2,882,244.25 on the theories of conversion, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. However, the court rejected plaintiffs' fraud claim and their demand for an accounting, constructive trust, and punitive damages. The court also dismissed defendants' counterclaim and third-party complaint.[3]

On September 14, the court entered judgment in the amount of $4,258,878.69 against defendants. On September 19, the court granted in part and denied in part defendants' motions for reconsideration and a stay. The court modified plaintiffs' damages award to $2,872,358.93 and stayed execution of the final judgment pending appeal.

The Chemtech defendants and Fariba appealed, and plaintiffs cross-appealed.

---

[3] Defendants did not appeal the dismissal of the counterclaim and third-party complaint.

A-0385-22

II.

When reviewing an order granting summary judgment, we use the same standard as the trial court. Sackman Enters., Inc. v. Mayor & Council of Belmar, 478 N.J. Super. 68, 75 (App. Div. 2024). Pursuant to Rule 4:46-2(c), summary judgment should be granted if "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." A court views the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 134 (App. Div. 2018) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 540 (1995)). The inquiry posed by the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Funtown Pier Amusements, Inc. v. Biscayne Ice Cream, 477 N.J. Super. 499, 511 (App. Div. 2024) (quoting Brill, 142 N.J. at 536). If the court determines that no genuine issue of material fact exists, then the reviewing court's inquiry is whether the trial court correctly interpreted the law. Dickson v. Cmty. Bus Lines, 458 N.J. Super. 522, 530 (App. Div. 2019). The trial court's legal conclusions are reviewed by the reviewing

court pursuant to a de novo standard. <u>Est. of Hanges v. Metro. Prop. & Cas. Ins. Co.</u>, 202 N.J. 369, 385 (2010).

We apply an abuse of discretion standard when we consider whether a trial court properly determined if a plaintiff could pursue a lawsuit as a direct action instead of a derivative action. <u>Brown v. Brown</u>, 323 N.J. Super. 30, 36 (App. Div. 1999). A trial court's decision should be affirmed when it makes a reasonable determination based on the record below. <u>Wadlow v. Wadlow</u>, 200 N.J. Super. 372, 382 (App. Div. 1985).

What's more, in a non-jury case, we should not disturb the findings of the trial judge unless they are "so wholly insupportable as to result in a denial of justice." <u>Jecker v. Hidden Valley, Inc.</u>, 422 N.J. Super. 155, 163 (App. Div. 2011) (quoting <u>Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.</u>, 65 N.J. 474, 483-84 (1974)). Specifically, factual conclusions should not be overturned unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" <u>Ibid.</u> (quoting <u>Seidman v. Clifton Sav. Bank, S.L.A.</u>, 205 N.J. 150, 169 (2011)).

At the appellate level, "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review." <u>Steele v. Steele</u>, 467 N.J.

A-0385-22

Super. 414, 440 (App. Div. 2021) (quoting Fastenberg v. Prudential Ins. Co., 309 N.J. Super. 415, 420 (App. Div. 1998)). We decide such purely legal questions without deferring to a lower court's "interpretation of the law and the legal consequences that flow from established facts." Camden City Bd. of Educ. v. McGreevey, 369 N.J. Super. 592, 604 (App. Div. 2004) (quoting Manalapan Realty, LP v. Twp. Comm., 140 N.J. 366, 378 (1995)); see also Zaman v. Felton, 219 N.J. 199, 216 (2014).

Finally, we note, "[a] Chancery judge has broad discretion 'to adapt equitable remedies to the particular circumstances of a given case.'" Tarta Luna Props., LLC v. Harvest Rest. Grp., LLC, 466 N.J. Super. 137, 153 (App. Div. 2021) (quoting Marioni v. Roxy Garments Delivery Co., 417 N.J. Super. 269, 275 (App. Div. 2010)).

## III.

### A.

In A-386-22, Fariba argues that the court erred because plaintiffs could not establish that they suffered a special injury in relation to their conversion claims and, thus, those claims should have been dismissed for a lack of derivative standing, either on summary judgment or at trial. We are unpersuaded.

When a shareholder sues to remedy corporate injuries, the action is in the form of a shareholder derivative action. Strasenburgh v. Straubmuller, 146 N.J. 527, 548-49 (1996).

> A shareholder derivative action is a unique and anomalous legal remedy. "The purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" Kamen v. Kemper Financial Svcs., Inc., 500 U.S. 90, 95 (1991) (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548 (1949)). The action functions as both a sword and a shield to directors. It is a sword in the hands of shareholders, yet it shields directors from direct shareholder actions for certain injuries.
>
> [Ibid.]

Shareholders can use a derivative action if they suspect that the corporation's management is behaving improperly or against the corporation's interests. Ibid. However, a shareholder may bring a direct action when claiming a special injury—a wrong not shared by other shareholders or that affects the plaintiffs' contractual rights. Tully v. Mirz, 457 N.J. Super. 114, 124 (App. Div. 2018). It is easier for shareholders of closely held companies to demonstrate a special injury and file a direct claim. See Mullenberg v. Bikon Corp., 143 N.J. 168, 181 (1996) (explaining that shareholders of closely held companies owe fiduciary duties to both the company and other shareholders).

25

The record supports the court's conclusion that plaintiffs were permitted to bring a direct action instead of a shareholder derivative action. The evidence adduced demonstrated that Emanuel, on behalf of Chemtech, A3I, and Fariba, misappropriated funds, altered financial records, provided plaintiffs with business records that inaccurately portrayed company value, inflated corporate liabilities, and diverted money to entities that only he and Fariba controlled. Fariba executed the 2017 SPA through which she purchased Mehta's shares at a lower value than they were worth. Further, A3I, a company where Fariba was the sole shareholder, contracted with DGNS to purchase DGNS's share of MRL. Because plaintiffs met their burden to show that defendants violated their fiduciary duties, it follows that the court did not abuse its discretion when it concluded that plaintiffs suffered a special injury and had standing to pursue a direct claim.

When a corporation is closely held, our courts have the discretion to characterize a derivative cause of action as a direct claim if such action will not expose the defendants to several actions, materially prejudice the interests of creditors of the corporation, or interfere with the distribution of recovery. Tully, 457 N.J. Super. at 125. The record shows this was the case here, as the direct action limited the number of suits that could have been pursued. Importantly,

A-0385-22

all the parties included in the direct suit included every interested individual and entity, allowing recovery to be efficient.

Finally, we note that in closely held corporations, it is permissible to depart from the standard derivative suit norms and focus on the actual relationships of the principal shareholders. We have applied this reasoning in Brown, where this court waived the usual derivative standing rules in a situation involving a closely held corporation. 323 N.J. Super. at 35. In Brown, we stated that when a cause of action presents a claim of corporate injury, the policy behind requiring a derivative action is less applicable if a closely held entity is involved. Id. at 37. In a derivative action, the corporation is under the control of the individuals who would have been defendants in the direct action. Id. at 37-38. This rationale applies here, as Chemtech was controlled only by Mehta and Emanuel, while A3I was solely controlled by Fariba.

We defer[4] to the trial court's supported factual findings and conclude it correctly found that plaintiffs suffered a special injury, enabling the direct claim exception to the derivative suit requirement.

---

[4] "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility" because of the "trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 594-95 (2020) (first quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998); and then citing State v. Elders, 192 N.J. 224, 244 (2007)).

A-0385-22

B.

Fariba and the Chemtech defendants contend that the court erred when it determined that they were liable for conversion. Fariba alleges that plaintiffs' failure to demand the return of the property was fatal to their claim and, also, that the court's finding of liability was unsupported by the evidence. The Chemtech defendants state that: plaintiffs failed to prove that the money belonged to them and was identifiable; plaintiffs failed to demand the return of the property; and the economic loss doctrine prohibited plaintiffs' recovery. We are unconvinced.

The court determined that Fariba and the Chemtech defendants were liable to plaintiffs on the conversion claims. It analyzed the questionable transactions step-by-step and examined the diversions, finding a maze of records that made it difficult for anyone to track the missing funds. It found that Emanuel controlled the money, created multiple accounts to divert funds, and then altered the financial records to prevent detection. The court recognized that defendants were comingling money and placing it into conduit accounts, including the personal accounts of Emanuel and Fariba. The court cited several transactions which tended to prove that conversion occurred. Finally, the court noted that

28

Fariba and Emanuel had a special relationship with plaintiffs because they were officers.

Fariba and the Chemtech defendants both argue that plaintiffs' conversion claim fails because they did not make a pre-suit demand for the return of the property, but the argument fails. These arguments were not raised below, and we need not consider the argument that a party failed to prove an element of a cause of action for the first time on appeal. See Liebling v. Garden State Indemnity, 337 N.J. Super. 447, 465 (App. Div. 2001); see also Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973); Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:6-2 (2025). While we are not required to consider these arguments, for completeness' sake, we comment briefly. The record shows Emanuel resisted requests from plaintiffs to turn over the relevant financial books and records during discovery and prior to trial. Given the evidence adduced at trial, we conclude plaintiffs' pre-suit demand requirement would have been futile. As to the Chemtech defendants' argument that plaintiffs failed to demand a return of the property, the record shows defendants designed an elaborate scheme to conceal their conversion of money from plaintiffs, continuing their efforts even after plaintiff received the tax delinquency notice.

Ultimately, Emanuel only turned over limited records. It follows that any demand from plaintiffs would have been futile.

Defendants also argue that plaintiffs failed to prove that the money belonged to them and was identifiable. We disagree, as the court found Prajapati's testimony credible. At trial, Emanuel could not explain where certain money went or, concerning traceable money, why it was deposited into his personal accounts. The record shows that the nine transactions the court relied upon when calculating damages were identifiable, the money was deposited into accounts controlled by Emanuel and Fariba, and plaintiffs did not receive similar amounts in the form of distributions. Moreover, the court repeatedly found that the web of transactions was so complex that it prevented the money from being accurately tracked. In instances where the money could not be traced to Emanuel's and Fariba's accounts, the court did not include those transactions in the damage calculation. Concerning the ultimate location of the money, in Charles Bloom & Co. v. Echo Jewelers, we recognized that a party which accepts responsibility for property should have the burden of producing evidence as to the fate of those goods because "[t]o hold otherwise would place an impossible burden on plaintiff." 279 N.J. Super. 372, 381 (App. Div. 1995).

30

Finally, we are not persuaded that the economic loss doctrine precludes plaintiffs' recovery under a conversion theory. In Saltiel v. GSI Consultants, Inc., the Court held that the economic loss doctrine precludes the tort liability of parties when the relationship between them is based on a contract, "unless the breaching party owes an independent duty imposed by law." 170 N.J. 297, 316-17 (2002). Here, Emanuel was the President of Chemtech, and he owed duties to Mehta outside of the Chemtech Shareholders Agreement. Emanuel was also the President of A3I. Similarly, Fariba owned A3I, and she owed shareholder duties to DGNS as a fifty percent owner of MRL, outside of duties owed by A3I to MRL. Moreover, the court heard testimony that Emanuel controlled the other entities, namely Chemtech LLC, Cubic, EFJ Realty, 29 Cottage, and VIP, to his own advantage to divert money into accounts that he shared with Fariba. Thus, a special relationship existed to allow plaintiffs to obtain relief greater than what was allowed under the terms of the various contracts including the MRL Operating Agreement, the Chemtech Shareholder Agreement, and the MIPA.[5] The court correctly found that DGNS's claim for conversion against MRL, A3I, Emanuel, Fariba, Chemtech LLC, Cubic, EFJ Realty, and VIP was successful.

---

[5] Explained in more detail below, the court did not allow for a double recovery on the disputed transactions.

Likewise, Mehta's claim for conversion against Emanuel, Chemtech, Chemtech LLC, Cubic, EFJ Realty, and VIP succeeded.

We conclude that there is more than adequate support in the record to support the court's determination that defendants were liable for conversion. There is no indication that the holding was manifestly unsupported by adequate, competent evidence. Plaintiffs proved that the money belonged to them and defendants exercised dominion over it. Any alleged failure of plaintiffs to demand the return of the property could not have precluded liability, because such a demand would have been futile. We discern no error by the trial court on the conversion issue.

C.

Fariba and the Chemtech defendants argue that the court erred when it determined that they were liable for breach of contract. Fariba and the Chemtech defendants contend that Fariba was not a party to the contracts cited by the court and that the court's holding was unsupported by the evidence. As to Emanuel, the Chemtech defendants claim that he was not a party to the MRL Operating Agreement. The Chemtech defendants also contend that the record only supports finding that Emanuel engaged in "sloppy bookkeeping." We disagree.

A-0385-22

A basic principle of contract construction is to determine the intent of the parties based on the language in the instrument. Karl's Sales & Serv., Inc. v. Gimbel Bros., 249 N.J. Super. 487, 492 (App. Div. 1991). When the provisions of a contract are unambiguous, they should be enforced by the court as they are written. Id. at 493. "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and [then] accord to the language a rational meaning in keeping with the express general purpose." Ibid. (quoting Owens v. Press Pub. Co., 20 N.J. 537, 543 (1956)).

A breach of contract claim requires a plaintiff to prove four elements by a preponderance of the evidence:

> first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."

A-0385-22

[Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (citing Model Jury Charge (Civil), 4.10A "The Contract Claim—Generally" (approved May 1998)).]

Regarding damages, "[a] breaching party is 'liable for all of the natural and probable consequences of the breach of [the] contract.'" Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)). Compensatory damages for breach of contract are designed to place the injured party in as good a monetary position as the injured party would have been if the contract had been performed as promised. Totaro, Duffy, Cannova & Co. v. Lane, Middleton & Co., 191 N.J. 1, 12-13 (2007). The monetary position in question depends on what the parties reasonably expected at the time they made the contract. Id. at 14. While the loss must be reasonably certain, the exact amount of the loss need not be certain. Ibid. (quoting Donovan v. Bachstadt, 91 N.J. 434, 445 (1982)).

The determination as to whether a contract was breached concerns questions of fact, which are reviewed pursuant to a deferential standard. Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 285-86 (App. Div. 1998). Whether a contract was breached and whether the breach was material are ordinarily questions of fact for the jury. Id. at 286. A "material breach" of a contract is defined as "a single occurrence or consistent recurrences which tend

to defeat the purpose of the contract." Ibid. (quoting Medivox Productions, Inc. v. Hoffmann-La Roche, Inc., 107 N.J. Super. 47, 59 (Law Div.1969)) (internal quotation marks omitted).

The trial court found that defendants breached the MRL Operating Agreement and the Chemtech Stockholders Agreement. Concerning the MRL Operating Agreement, the court determined that Fariba, A3I, and Emanuel, as the President of A3I, breached their contractual obligations. The court stated that plaintiffs did not approve of withdrawals of capital from MRL by Emanuel, were not able to share in the profits, and did not get distributions. The court explained Fariba became part of the case when MRL became a minority-owned business in 2017. It found there was a special relationship between Mehta and Emanuel because there was a contractual duty between them created by the Chemtech Stockholders Agreement. Additionally, the 2007 Chemtech Stockholders Agreement stated that a shareholder vote was required to execute an expenditure of funds.

The record shows that Emanuel diverted funds to accounts that he owned with Fariba and that equal distributions were not made to plaintiffs. Emanuel and Chemtech were liable to Mehta for breach of contract under the terms of the Chemtech Shareholder Agreement, which stated that "[a]ll decisions regarding

35

the operation of the business of [Chemtech] and the expenditure of the funds thereof shall be made by majority vote of the Stockholders[.]" Credible evidence shows that Emanuel diverted money through a complex maze of accounts to prevent detection by Mehta. There was no evidence in the record to prove these monies were approved by a vote or that Mehta was aware of the transactions until after he received the tax notice from the State. It follows that plaintiffs proved that Emanuel was using company funds without authorization and failed to distribute profits in violation of the Chemtech Stockholder's Agreement.

Likewise, MRL and A3I, both owned by Fariba and controlled by Emanuel, were liable for breach of contract to DGNS under the terms of the MRL Operating Agreement that was signed by Fariba. The MRL Operating Agreement stated that "[n]o member shall make any withdrawals from capital without prior approval of [MRL]." In addition, it stated "[e]ach of the parties to this agreement hereby covenants and agrees to cause all known business transactions pertaining to the purpose of [MRL], to be entered properly and completely into [the MRL company] book[.]" The MRL Operating Agreement was breached because the record demonstrates that Emanuel controlled MRL and A3I, and then used those entities to divert funds to accounts that he shared

A-0385-22

with Fariba. Also, the MRL Operating Agreement allows for DGNS to obtain damages from Fariba and A3I. Fariba, on behalf of A3I, indemnified DGNS against "any and all claims, demands and actions of every kind and nature whatsoever which may arise out of or by reason of such violation of any terms and conditions of" the MRL Operating Agreement.

In addition to those two contracts, there was additional language in the MIPA to hold Emanuel liable for breach of contract, as he executed the document on behalf of A3I as the President of A3I. The terms of the MIPA stated that A3I agreed to pay DGNS "any" damages stemming from "any material inaccuracy or breach of any representation or warranty," material inaccuracies "in any other document delivered by Buyer," and "any material breach or violation of the covenants or agreements." Again, A3I was owned by Fariba and controlled by Emanuel, who signed the MIPA. Thus, there is evidence in the record that MRL and A3I violated the MIPA and were liable to DGNS for damages.

The 2017 SPA contains language to hold Fariba liable for breach of contract. The 2017 SPA signed by Fariba and Mehta stated that Fariba agreed to indemnify Mehta for "any and all" losses arising out of material inaccuracies or breaches of any representation or warranty, any material breach or violation

of the covenants or agreements, and any material inaccuracy in any certificate, instrument or other documents. The record reflects that Emanuel, who controlled the financial mechanics and documents for Chemtech, diverted funds to accounts and entities controlled by himself and Fariba. Thus, there was evidence in the record that Fariba violated the 2017 SPA and is liable to Mehta for damages. Notably, Emanuel also executed the 2014 SPA, which contained similar breach and indemnification terms as the 2017 SPA.

In sum, the ample record supports the trial court's findings that MRL, A3I, Chemtech, Fariba, and Emanuel were liable for breach of contract to Mehta and DGNS. We discern no reason to contradict those findings.

D.

Fariba and the Chemtech defendants contend that the court erred when it held they were liable for breaching the covenant of good faith and fair dealing because there was no support in the record to sustain that finding. We disagree.

"The implied covenant of good faith and fair dealing requires the 'parties to a contract to refrain from doing "anything which will have the effect of destroying or injuring the right of the other party to receive" the benefits of the contract.'" Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 63 (2024) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr.

Assocs., 182 N.J. 210, 224 (2005)).  "Although proof of bad motive or intention is vital to the claim, such proof is not enough on its own.  Rather, a plaintiff must demonstrate that the defendant's alleged misdeeds prevented the plaintiff from enjoying the full benefit of the terms of a particular bargain."  Ibid. (citation omitted) (internal quotation marks omitted).  Bad faith is determined by the trier of fact based upon proofs of the breaching party's state of mind and the surrounding circumstances.  Seidenberg v. Summit Bank, 348 N.J. Super. 243, 263 (App. Div. 2002).

We review the same portion of the record that applies to the breach of contract analysis.  There is evidence that MRL and A3I violated the MRL Operating Agreement and, also, that Emanuel and Chemtech violated the Chemtech Shareholders Agreement and both SPAs.  Again, the MRL Operating Agreement contained an indemnification provision that stated that A3I and MRL were liable to DGNS for any material breaches or violations of any covenants in the MIPA.  Also, the 2014 SPA signed by Emanuel and 2017 SPA signed by Fariba contained indemnification provisions for any material breaches of violations of the covenants in each SPA.  As to the 2014 SPA, the record shows that Emanuel breached the covenant of good faith and fair dealing when he

falsified data. Indeed, Emanuel relied on the same falsified documents at the time Fariba executed the 2017 SPA with Mehta.

The court accepted as credible Prajapati's testimony that Emanuel diverted money to outside accounts under his and Fariba's control. The court found the record showed that Emanuel intended those diversions to be kept from plaintiffs to their detriment. There was evidence in the record that Emanuel moved money between the various accounts through conduit accounts, commingled monies, and step-transactions. Emanuel could not explain at trial why the diverted monies ended up in his personal accounts that he shared with Fariba.

In sum, there is ample credible evidence in the record to support the trial court's finding that plaintiffs had proven that Emanuel, Fariba, Chemtech, MRL, and A3I violated the covenant of good faith and fair dealing inherent in the various contracts that they executed. Its conclusions are not so manifestly unsupported by the record that affirmance would constitute a denial of justice.

E.

Fariba and the Chemtech defendants argue that the court erred when it held that they were liable for unjust enrichment because there was no support in the record to sustain that conclusion. We are unconvinced.

"A cause of action for unjust enrichment requires proof that a defendant received a benefit and that retention of that benefit without payment would be unjust." Inv'rs Bank v. Torres, 457 N.J. Super. 53, 62 (App. Div. 2018) (quoting Cty. of Essex v. First Union Nat'l Bank, 373 N.J. Super. 543, 549-50 (App. Div. 2004)). A party can be unjustly enriched even if there is no contract between the parties. Insulation Contractor & Supply v. Kravco, Inc., 209 N.J. Super. 367, 376 n.4 (App. Div. 1986) ("Restitution and unjust enrichment are both quasi-contractual in nature." (italicization omitted)). That said, "[b]ecause unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for remuneration, a plaintiff may recover on one or the other theory, but not both." Caputo v. Nice-Pak Prods., Inc., 300 N.J. Super. 498, 507 (App. Div. 1997).

As a threshold matter, once the trial court found breach of contract, plaintiffs could not recover again for the same losses on a theory of unjust enrichment. Caputo, 300 N.J. Super. at 507. However, the court did not award double damages for the contract claims and the unjust enrichment claims. Rather, the court discounted millions of dollars of transactions that Prajapati claimed were improper because the money could not be traced. The final

41

compensatory damages award was one lump sum based on the tally of monies that were both diverted and traceable.

There is ample, credible evidence in the record to support the trial court's conclusion that Fariba and the Chemtech defendants received a benefit by taking unauthorized monies from Chemtech and MRL and, also, that the retention of those monies was unjust. The limited bookkeeping obtained by plaintiffs in discovery led Prajapati to conclude that the monies were inappropriately taken. The court found that Prajapati's testimony was credible in this regard. It further reviewed Prajapati's written report and schedules when it isolated only the transactions where Emanuel clearly diverted money and did not make a similar disbursement to plaintiffs. Critically, there was a special relationship between the parties that exceeded their contractual obligations. Emanuel was the President of Chemtech and A3I. Further, the record showed that Emanuel used other entities that he controlled to facilitate his diversion of money, including Chemtech LLC, Cubic, EFJ Realty and VIP. Meanwhile, Fariba was the sole shareholder of A3I and, after the MIPA was executed, was the sole shareholder of MRL.

We conclude the court did not err when it found Emanuel, Chemtech, Chemtech LLC, Cubic, EFJ Realty and VIP were liable to Mehta and, also,

MRL, A3I, Emanuel, Fariba, Chemtech LLC, Cubic, EFJ Realty, and VIP were liable to DGNS for unjust enrichment. The court's factual findings were not so "clearly mistaken" or "wide of the mark" to require the panel to interfere to prevent a denial of justice. See N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

F.

Fariba and the Chemtech defendants contend that the court's reliance on transactions that occurred more than six years before the complaint was filed produced an unjust result. Also, Fariba and the Chemtech defendants argue that the claims for conversion, breach of the covenant of good faith and fair dealing, and unjust enrichment were all barred by the six-year statute of limitations. We are again unpersuaded.

Notably, "[t]he primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims." W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 563 (1989). A statute of limitations promotes those purposes by preventing a plaintiff from filing those causes of action after the statutory period has expired. O'Keeffe v. Snyder, 83 N.J. 478, 491 (1980). "However, where defendants are on notice of the claims, and no significant prejudice results, the policy reasons

A-0385-22

for upholding a strict statute of limitations recede." W.V. Pangborne, 116 N.J. at 563.

Additionally, we have recognized that the statute of limitations is tolled until the plaintiff discovers or should have discovered by an exercise of reasonable diligence, that he or she has an actionable claim. Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016). "Under the [discovery] rule, a claim does not accrue until the plaintiff 'discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.'" Ibid. (quoting Lopez v. Swyer, 62 N.J. 267, 272 (1973)). While this rule does not generally apply for matters involving a breach of contract, it can apply in cases involving misrepresentation. Cty. of Morris v. Fauver, 153 N.J. 80, 110 (1998) (citing Gibbons v. Kosuga, 121 N.J. Super. 252 (Law Div. 1972)). Under the doctrine of fraudulent concealment, the statute of limitations can be tolled when a defendant engages in unintentional or intentional fraud or concealment. Trinity Church v. Lawson-Bell, 394 N.J. Super. 159, 168 (App. Div. 2007).

Review "of a trial judge's decision as to the applicable statute of limitations is plenary and de novo." Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat'l Bank, 390 N.J. Super. 199, 203 (App. Div. 2007). Furthermore, a

44

reviewing court may only reverse on an issue not raised below if the trial court committed plain error.  Johnson v. Benjamin Moore & Co., 347 N.J. Super. 71, 97 (App. Div. 2002).

On December 20, 2021, during oral argument on defendants' motion for summary judgment, defendants argued that the statute of limitations applied to bar plaintiffs' claim for unpaid compensation because it stemmed from a 2007 employment agreement.  The court dismissed the unpaid compensation claim due to the expiration of the statute of limitations.  On June 30, 2022, when the court rendered its decision, it recognized that, "[a]s far as any kind of statute of limitations claim, on the discovery rule, when you find something out, conversion has a six-year statute of limitation, as do[] the contract claims[.]"  At the time of this statement, neither Fariba nor the Chemtech defendants objected to the court's conclusion or argued that any of the remaining claims were barred by the statute of limitations.

Here, Fariba and the Chemtech defendants argue that seven transactions dated prior to the filing of plaintiffs' initial complaint on January 20, 2020, were wrongfully included in the court's computation of the judgment.  Further, Fariba and the Chemtech defendants claim that the court was on notice that they

intended to challenge the claims as being untimely because they pled a statute of limitations affirmative defense in their answer.

However, the record reflects that Fariba and the Chemtech defendants only raised the statute of limitations argument as to Mehta's unpaid compensation claim, which was dismissed on summary judgment. There is no evidence that Fariba and the Chemtech defendants later argued, and proved by a preponderance of the evidence, that the affirmative statute of limitations defense applied to the remaining claims. A defendant's failure to assert a statute of limitations defense during the proceedings waives the defense, even if was pled in the answer. See Williams v. Bell Tel. Labs. Inc., 132 N.J. 109, 118-20 (1993). As a result, the statute of limitations defense was waived below. Thus, their failure to assert a statute of limitations defense during the proceedings waives the defense, even though Fariba and the Chemtech defendants pled it in their answer.

G.

Fariba and the Chemtech defendants argue that the court erred in permitting plaintiffs' expert to present net opinion testimony at trial. We disagree.

A-0385-22

Under N.J.R.E. 703, an expert's opinion must be "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert, which is not necessarily admissible in evidence, but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty of Essex, 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (quoting Polzo, 196 N.J. at 583). The rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

"An expert's conclusion is excluded if it is based merely on unfounded speculation and unquantified possibilities." Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)) (internal quotation marks omitted). Medical-opinion testimony concerning the cause of an injury "'must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.'" State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)

A-0385-22

(quoting Johnesee v. Stop & Shop Cos., Inc., 174 N.J. Super. 426, 431 (App. Div. 1980)). "[A]n expert offers an inadmissible net opinion if he or she cannot offer objective support for his or her opinions but testifies only to a view about a standard that is personal." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011)) (internal quotation marks omitted). Expert opinion must be excluded if it is based merely on unfounded speculation and unquantified possibilities. Grzanka, 301 N.J. at 580. An expert's opinion that fails to address facts in the record that directly contradict the expert's conclusions should be barred as a net opinion. Smith v. Est. of Kelly, 343 N.J. Super 480, 497 (App. Div. 2001).

On December 20, 2021, the court denied Fariba's and the Chemtech defendants' motions to preclude net opinions in relation to Prajapati's upcoming trial testimony. The court explained that any objections to Prajapati's testimony could be challenged in voir dire or through objections because it was premature to exclude the testimony without considering a full record .

At trial, Fariba and the Chemtech defendants questioned Prajapati through voir dire and challenged his qualifications as a forensic accountant. The court accepted Prajapati as an expert in forensic accounting, explained that any

questions as to Prajapati's experience pertained to the weight of the testimony, and found that the testimony would assist the trier of fact.

The court found Prajapati credible, but did not agree with his conclusion that the damages totaled $10 million. It recognized that numerous funds could not be traced, so it was unclear how the value of the companies would have been affected. Thus, Prajapati's decision to add the questionable transactions to the purchase price was not a proper valuation of the companies. However, the court found that Prajapati's testimony was credible as to the existence of conduit accounts, step transactions, diverted monies, unauthorized management fees, duplicable expenses, and commingled funds. It identified certain transactions isolated by Prajapati, where the funds could be traced to Emanuel's and Fariba's account, when computing damages.

Concerning the challenges to Prajapati's testimony, the court was measured about what it allowed, sustaining some of Emanuel's counsel's objections and overruling others. It allowed Prajapati to explain the basis for his reasoning while also sustaining objections and giving less weight to Prajapati's claims that were unsupported by evidence. Likewise, the court rejected Prajapati's statements about the value of the business because Prajapati did not perform a business valuation.

A-0385-22

At trial, Prajapati explained his methodology for determining that the data in certain exhibits was altered. He explained that he reviewed tax returns and compared those to the data in QuickBooks to determine that the financial books did not match the tax returns. He explained how he concluded that various accounts lacked important details, funds were commingled, and that the balances in the accounts did not match when compared to other records. What is more, he discovered fake accounts and duplicate expenses that created a web of transactions that allowed Emanuel to divert funds. While he admitted that he did not perform a business valuation, he concluded that plaintiffs suffered nearly $10 million in damages. The trial court accepted Prajapati's conclusion about transactions where the monies could be traced back to accounts that Emanuel and Fariba controlled.

In sum, Prajapati did not offer a net opinion at trial and the court's decision to deny defendants' motion to exclude his testimony was proper. The record shows no abuse of discretion here.

H.

Fariba and the Chemtech defendants argue that the court erred as a matter of law and, also, abused its discretion when it awarded plaintiffs' attorney's fees and costs. We affirm the trial court's order.

A-0385-22

"Trial courts have considerable latitude in resolving fee applications, and a reviewing court will not set aside an award of attorneys' fees except 'on the rarest occasions, and then only because of a clear abuse of discretion.'" Grow Co. v. Chokshi, 424 N.J. Super. 357, 367 (App. Div. 2012) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). "[A] trial court must analyze the Rendine factors in determining an award of reasonable counsel fees and then must state its reasons on the record for awarding a particular fee." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004) (citing R. 1:7-4(a)). We reverse a fee determination if it was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." C.E. v. Elizabeth Pub. Sch. Dist., 472 N.J. Super. 253, 262 (App. Div. 2022). To determine whether a fee award is reasonable, the lawsuit must be causally related to securing the relief obtained, the prevailing party's efforts must be necessary, and the prevailing party's efforts must be an important factor in obtaining the relief. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009).

In granting an award of attorneys' fees, "[t]he court's first step . . . is determining the lodestar, 'which equals "the number of hours reasonably expended multiplied by a reasonable hourly rate."'" Jacobs v. Mark Lindsay &

Son Plumbing & Heating, Inc., 458 N.J. Super. 194, 209 (App. Div. 2019) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004)). Determination of the lodestar "is the most significant element in the award of a reasonable fee because that function requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Rendine, 141 N.J. at 335.

> There are four considerations in setting the lodestar. The first is the reasonableness of the attorney's fee, evaluated under the factors set forth in RPC 1.5(a). Second, the court considers the reasonableness of the time billed by the attorney, since a party is not entitled to counsel fees for excessive and unnecessary hours. Third, the court determines whether the award should be decreased because the plaintiff "achieved limited success in relation to the relief he [or she] had sought." Fourth, the court must decide whether the attorney is entitled to a fee enhancement if the attorney worked under a contingency agreement.
>
> [Heyert v. Taddese, 431 N.J. Super. 388, 443-44 (App. Div. 2013) (footnote omitted) (citations omitted).]

As a threshold matter, fee-shifting is permissible when expressly authorized by statute, court rule, and contract. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001). Here, the court concluded that Fariba and the Chemtech defendants breached the MRL Operating Agreement, including

52

Section XX, which required members to indemnify other members for "any and all claims . . . of every kind and nature whatsoever" arising from a violation.

We conclude the trial court did not err when it determined that Fariba in the 2017 SPA and, also, the Chemtech defendants in the 2014 SPA, violated the contracts, which then triggered the provisions containing fee-shifting language. That fee-shifting language states that Fariba and the Chemtech defendants agreed to indemnify and hold harmless plaintiffs "from and against any and all Losses . . . arising out of, resulting from, or relating to" material inaccuracies, breaches of representations or warranties, material breaches or violations of covenants, and material inaccuracies in documents. Further, both SPAs defined "Losses" as "any and all obligations, . . . claims, actions, injuries, demands, suits, judgments, proceedings, investigations, arbitrations, and reasonable expenses, including reasonable accountant's and reasonable attorney's fees and expenses[.]" Importantly, our Court has already explained that an explicit reference to an award of attorney's fees as part of a definition of "losses" is sufficient for the court to award attorney's fees. Litton, 200 N.J. at 385.

We discern no error where the trial court concluded that Emanuel violated Section 3.2(b) of the 2014 SPA when he stated that the purchase would not result in the breach of any agreements, contracts, or arrangements that he made.

Emanuel made a similar representation on behalf of Chemtech and stated that Chemtech would not violate any provision. Fariba made similar representations in the 2017 SPA.

The trial court concluded that Emanuel violated the MIPA and, therefore, triggered the indemnity provision in that document. The MIPA stated that Emanuel would pay Mehta "any [d]amages, arising out of, resulting from, or relating to" any material inaccuracies, breaches of any representations, breaches of warranties, and any material breaches or violations of covenants or agreements. Section 6.2 of the MIPA defined damages as including attorney's fees, costs of suit, and costs of investigation. The court's decision to award attorney's fees was proper.

The fee award was reasonable and comports with our jurisprudence. We note the court did not award fees without scrutiny, as it reduced the amount sought by plaintiffs by over $8 million. The trial court carefully reviewed plaintiffs' submissions and properly applied the law, including Rendine and RPC 1.5(a). It considered Fariba's and the Chemtech defendants' arguments. Importantly, the court discussed the extensive record developed at trial depicting defendants' highly complex series of transactions using conduit and commingled accounts which made tracing the disputed funds extremely difficult.

A-0385-22

"Because the trial court was in the best position to weigh the equities and arguments of the parties in this lengthy and contentious case," Packard-Bamberger, 167 N.J. at 447, we see no reason to disturb its award of attorney's fees and costs.

I.

On their cross-appeals, plaintiffs make a two-step argument that the court abused its discretion when it declined to award prejudgment interest attributable to each misappropriation for a total amount of $838,810.40. Plaintiffs first contend that the court's application of Rule 4:42-11(b) to calculate interest only from the date of the complaint did not fairly reflect the extent of their losses, which dated back to when defendants misappropriated the funds. Next, plaintiffs posit that the court committed error when it did not award prejudgment interest for each misappropriation on the dates they occurred since Fariba and the Chemtech defendants had the benefit of the monies to which plaintiffs were entitled.

Rule 4:42-11(b) states that, specifically in tort actions, prejudgment interest is calculated using "the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later." Rule 4:42-11(b) permits a suspension of prejudgment interest in exceptional

circumstances. <u>McKeand v. Gerhard</u>, 331 N.J. Super. 122, 127-28 (App. Div. 2000); <u>see also</u> <u>Wiese v. Dedhia</u>, 354 N.J. Super. 256, 267 (App. Div. 2002) (stating that trial court has discretion to deny prejudgment interest, but such decision should consider "policy, spirit, and intent of rule").

Here, the court correctly applied <u>Rule</u> 4:42-11(b) to determine the date that the complaint was filed in July 2020 was the date to begin calculating prejudgment interest. For completeness, we note that "[u]nlike prejudgment interest in tort actions, which is expressly governed by <u>Rule</u> 4:42-11(b), the award of prejudgment interest on contract and equitable claims is based on equitable principles." <u>County of Essex v. First Union Nat'l Bank</u>, 186 N.J. 46, 61 (2006). An award of prejudgment interest on contract and equitable claims is left entirely to the discretion of the trial court and should not be reversed unless the award constitutes a manifest denial of justice. <u>Ibid.</u> The trial court held that it would be unfair and not equitable, akin to "piling on," to award prejudgment interest back to the date of each misappropriation. We are unconvinced the trial court's reasoned judgment on this question results in a manifest denial of justice.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0385-22